191 F.3d 777 (7th Cir. 1999)
 TOM LACHMUND, Plaintiff-Appellant,
v.
ADM INVESTOR SERVICES, INCORPORATED, a Delaware Corporation, A/C TRADING COMPANY, an Indiana general partnership doing business as A/C TRADING 2000, and DEMETER INCORPORATED, an Indiana corporation, Defendants-Appellees.
 No. 98-3467
 United States Court of Appeals, Seventh Circuit
 Argued February 23, 1999
Decided September 13, 1999
 
 Appeal from the United States District Court for the Northern District of Indiana, Hammond Division. No. 97 C 92--James T. Moody, Judge.[Copyrighted Material Omitted]
 Before COFFEY, RIPPLE and ROVNER, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 Tom Lachmund brought this action against three businesses under the Commodity Exchange Act ("CEA"), the Racketeering Influenced and Corrupt Organizations Act ("RICO"), and state law. He alleged a conspiracy of fraudulent misrepresentation with respect to certain contracts for the sale of grain. Pursuant to Rule 12(b)(6), the district court dismissed Mr. Lachmund's federal claims in their entirety and the state law fraud claim with respect to one of the defendants. The court declined to retain supplemental jurisdiction over the remaining state law claims. Mr. Lachmund now seeks review of the Rule 12(b)(6) dismissals. For the reasons set forth in the following opinion, we affirm the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Hedge-to-Arrive Contracts
 
 3
 A hedge-to-arrive contract ("HTA") is an agreement between a farmer and a grain elevator for the sale of a fixed quantity of grain for delivery at a specific time in the future. The parties agree to a price per bushel set by reference to the Chicago Board of Trade ("CBOT") futures price for a particular month, plus or minus a basis (an adjustment that reflects local variables, such as the cost of transportation, storage, labor, and utilities). The futures reference price is fixed at the time of contracting, but the basis floats until the farmer decides to fix it, sometime before an agreed upon pricing deadline. If the farmer does not fix the basis within the specified time, it will be set automatically by the terms of the HTA. See Eby v. Producers Co-op, Inc., 959 F. Supp. 428, 430 n.1 (W.D. Mich. 1997); Farmers Co- op. Co. v. Lambert, No. LACV305569, 1999 WL 177473, at *3 (Iowa Dist. Ct. 1999); Matthew J. Cole, Note, Hedge-To-Arrive Contracts: The Second Chapter of the Farm Crisis, 1 Drake J. Agric. L. 243, 246 (1996).
 
 
 4
 HTA contracts benefit farmers by permitting them to lock in a particular price and to guarantee themselves a buyer for their grain prior to delivery. They face a risk, however, that grain prices will rise and that they will be committed to selling their grain at an agreed price below the current market value. By the same token, the elevator faces a risk that the futures reference price will fall, leaving the elevator locked into a price above the current market price. Each party can hedge against these risks by establishing a position in the futures market that is opposite to its contract position. For example, the elevator would hedge its risk when it contracts with a farmer by simultaneously establishing a "short" position (an obligation to sell) in the futures market for the month of delivery to offset its obligation to buy from the farmer. See Eby, 959 F. Supp.at 430 n.1; Lambert, 1999 WL 177473, at *4; Cole, supra, at 246.
 
 
 5
 Some HTA contracts (or the parties' practice under such contracts) allow the farmer to "roll" the delivery obligation to some future date, either to accommodate shortfalls in the crop yield or to allow the farmer to sell the grain on the "spot" (cash) market for a better price. When a farmer opts to roll an HTA to a later month, the elevator cancels or offsets its futures hedge in the original delivery month (by entering an obligation to buy the same quantity that it is obligated to sell) and then rehedges by establishing a new short position in the new delivery month. The price difference, as of the date of the roll, between the new and old futures months--the "spread"--is then added to the price per bushel of the original HTA. The farmer thus absorbs this spread, whether it is positive or negative. See Eby, 959 F. Supp. at 430 n.1; Lambert, 1999 WL 177473, at *4-5; Cole, supra, at 250.
 
 
 6
 B. Facts Pertaining to Mr. Lachmund's Claims
 
 
 7
 ADM Investor Services, Inc. ("ADMIS") is a corporation registered with the Commodity Futures Trading Commission ("CFTC") as a Futures Commission Merchant. A/C Trading Co. ("A/C") is an Indiana general partnership registered with the CFTC as an Introducing Broker ("IB").[1] A/C Trading 2000 ("A/C 2000") is an Indiana general partnership run by James Gerlach and engaged in the business of agricultural consulting. Demeter, Inc. ("Demeter") is a corporation operating a grain elevator. Plaintiff Tom Lachmund is an Indiana farmer.
 
 
 8
 In January 1995, Mr. Lachmund entered into a consulting agreement with A/C 2000. Pursuant to A/C 2000's (Gerlach's) advice and consultation, Mr. Lachmund opened a commodity futures and options trading account with ADMIS and entered into a series of HTA grain contracts with Demeter for the sale of Mr. Lachmund's estimated annual yield in 1995 and 1996.[2] He also purchased some off-exchange options directly from Demeter in 1995 and conducted some options transactions in his ADMIS account in 1996 to hedge against loss on the HTA contracts.
 
 
 9
 When Mr. Lachmund's crop yield fell short of the contract amounts, he was able to roll the undelivered amounts forward to later crop futures months, even to the next crop year. After a series of rolls, however, Demeter informed Mr. Lachmund in 1996 that it would no longer allow HTA contracts to be rolled beyond the end of a crop year so that each HTA contract had to be settled at the end of the crop year, either by delivery of grain or by cash transaction. Demeter then charged Mr. Lachmund's account with a debit of $304,597.26. Meanwhile, the options Mr. Lachmund had purchased failed to buffer his losses on the HTA contracts.
 
 
 10
 Mr. Lachmund brought this action under the CEA, RICO, and state law, alleging a conspiracy of fraudulent misrepresentation with respect to his contracts with Demeter. In his complaint, Mr. Lachmund claims that ADMIS, A/C, and other entities conspired to evade the CFTC's futures market regulations by engaging in off-exchange futures market activities through HTA contracts with farmers. The purpose of this alleged conspiracy, according to Mr. Lachmund, was to attract business to ADMIS and its IBs by misrepresenting the HTA contracts as a risk-free method of selling future crops. The HTA contracts were in fact, Mr. Lachmund claims, illegal off- exchange futures contracts because the grain purportedly sold by the contracts did not have to be delivered within the crop year. That the purpose of the contracts was not to transfer actual grain, he alleges, is evidenced by the fact that farmers were encouraged to enter into HTAs for grain quantities greater than they could produce in a crop year, that many HTAs did not specify a delivery date, that the farmers could engage in unlimited rolling of their delivery obligations, and that the contracts could be settled by a cash buy-out at any time.
 
 
 11
 Mr. Lachmund claims that Gerlach failed to inform him of various material facts concerning the risks involved in the contracts and options program. He claims that Gerlach falsely led him to believe that the only risk would be the price of the options purchased to hedge against the risk of price movement between the time of contracting and the time of delivery. Gerlach failed to inform him of the risk of unlimited liability for inverse crop year spreads in a program in which shortfalls are rolled into the next year. Had the defendants informed him of the actual risks associated with the HTA contracts, Mr. Lachmund asserts, he would not have entered into the contracts, and he would not have opened a trading account with ADMIS.
 
 C. Holding of the District Court
 
 12
 The district court granted the defendants' motions to dismiss Mr. Lachmund's RICO and CEA claims and his state law fraud claim against ADMIS.[3] The district court first held that Mr. Lachmund had not stated a claim for fraud against ADMIS because the complaint did not adequately plead agency between Gerlach and ADMIS. The court noted that the complaint pleaded no facts indicating that ADMIS knew of Mr. Lachmund's grain contracts or that it cloaked Gerlach, A/C, or A/C 2000 with actual or apparent authority to act on ADMIS's behalf with respect to such contracts or any futures transactions. The court concluded that the allegation of a guarantee agreement between ADMIS and A/C was insufficient to plead agency, even under the liberal pleading requirements of the federal rules.
 
 
 13
 The district court next held that Mr. Lachmund did not plead any RICO violations adequately under Federal Rule of Civil Procedure 9(b). Mr. Lachmund's agency allegations were insufficient to plead that ADMIS violated 18 U.S.C. sec. 1962(c) through any agents. Likewise, the court held, his complaint failed to plead any direct violation of sec. 1962(c) by ADMIS with the particularity required by Rule 9(b). The court further found that Mr. Lachmund's complaint did not adequately plead a conspiracy among the defendants in violation of sec. 1962(d) or any violation of sec. 1962(a) by A/C or ADMIS.
 
 
 14
 Finally, the district court held that Mr. Lachmund did not adequately plead a claim under the CEA because the HTA contracts were cash forward contracts that are exempt from regulation under the CEA. Because the contracts were between a farmer and a grain elevator and contemplated the physical transfer of actual grain, and because the complaint did not contain allegations that the parties' intentions were purely speculative or any other indication that the contracts were "futures contracts" as opposed to cash forward contracts for the exchange of actual grain, the court held that the contracts were classic cash forward contracts exempt from the CEA.
 
 II
 DISCUSSION
 A. Standard of Review
 
 15
 This case comes to us on appeal from the district court's decision to dismiss the complaint for failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6). We review de novo the district court's decision to grant a Rule 12(b)(6) motion, taking as true all of Mr. Lachmund's well-pleaded factual allegations and drawing all reasonable inferences in his favor. See Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp., 179 F.3d 523, 526 (7th Cir. 1999). We shall affirm the district court's ruling only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)) (internal quotation marks omitted).
 
 
 16
 In reviewing the sufficiency of Mr. Lachmund's complaint, we must be mindful that the Federal Rules of Civil Procedure have established a heightened pleading requirement for allegations of fraud: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). This heightened standard applies not only to Mr. Lachmund's fraud claim but also to his RICO claims. See Goren v. New Vision Int'l, Inc., 156 F.3d 721, 726 (7th Cir. 1998); Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir. 1992). In order to survive dismissal on a Rule 12(b)(6) motion, the complaint "must plead the 'who, what, when, and where' of the alleged fraud." Id.[4]
 
 B. Agency and the State Law Fraud Claim
 
 17
 We turn now to the district court's decision to dismiss Mr. Lachmund's state law fraud claim against defendant ADMIS. The district court dismissed this claim on the ground that the complaint did not adequately plead agency between ADMIS and Gerlach, A/C, or A/C 2000. The first question we must address is whether a plaintiff alleging fraud by a principal through the actions of an agent must plead the agency relationship under the general standards set forth in Rule 8(a) of the Federal Rules of Civil Procedure[5] or whether such an allegation is governed by the heightened standard required for allegations of fraud under Rule 9(b).[6]
 
 
 18
 In resolving this issue, we think that the best starting point is to recall that the Rules of Civil Procedure were intended to be read not in isolation from each other but together. We therefore must focus first on the relationship between Rule 8(a) and Rule 9(b). By its terms, Rule 9(b)'s particularity requirement applies only to allegations of fraud. It is a special pleading requirement that contrasts significantly with the general standard enunciated in Rule 8. Therefore, we must take care not to permit the more demanding standard of Rule 9(b) to encroach unduly on the general approach to pleading that Congress has established in Rule 8. Rule 9(b) can most effectively be confined to its proper domain when we remember that its purpose is to ensure that the party accused of fraud, a matter implying some degree of moral turpitude and often involving a "wide variety of potential conduct,"[7] is given adequate notice of the specific activity that the plaintiff claims constituted the fraud so that the accused party may file an effective responsive pleading. Courts have a special institutional interest in seeing that such allegations are made with care so that claims advanced solely for their nuisance or settlement value can be quickly identified and valuable public judicial resources not wasted.
 
 
 19
 Agency may be established in a variety of ways. However, when the plaintiff relies upon the same circumstances to establish both the alleged fraud and the agency relationship of a defendant, the reasons for more particularized pleading that animate Rule 9(b) apply with equal force to the issue of agency and to the underlying fraud claim.
 
 
 20
 Here, Mr. Lachmund submits that his complaint adequately pleads agency because it alleges the specific fact that A/C is a guaranteed IB of ADMIS. However, we agree with the CFTC that this status, by itself, is not sufficient to give an IB the status of an agent. See Violette v. First Options of Chicago, Inc., No. 95-R128, 1997 WL 71438, at *3 (CFTC Feb. 20, 1997). Mr. Lachmund also relies on the allegations of conspiracy in his complaint to allege an agency relationship between any of the other defendants and ADMIS. In this respect, he depends, of course, on the substantive allegations of fraud to establish the agency relationship. We must hold that such general allegations do not contain the requisite particularity necessary to show that ADMIS had vested actual or apparent authority in A/C, A/C 2000, or any other entity to act on its behalf with respect to the grain contracts.
 
 
 21
 We therefore affirm the district court's decision to dismiss the state law fraud claim against ADMIS.
 
 C. RICO Claims
 
 22
 The district court dismissed Mr. Lachmund's RICO claims for violations of 18 U.S.C. sec. 1962(a), (c), and (d) on the ground that his amended complaint did not plead the elements of those claims adequately under the standard in Federal Rule of Civil Procedure 9(b). We now review the district court's determination.
 
 1.
 18 U.S.C. sec. 1962(c)
 
 23
 In Count I of his complaint, Mr. Lachmund alleges that ADMIS violated 18 U.S.C. sec. 1962(c).[8] "A RICO plaintiff alleging a violation of sec. 1962(c) must show '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" Vicom, Inc. v. Harbridge Merchant Servs., Inc., 20 F.3d 771, 778 (7th Cir. 1994) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346(1985) (footnote omitted)); Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1019 (7th Cir. 1992). We have held that the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to allegations of fraud in a civil RICO complaint. See Goren v. New Vision Int'l, Inc., 156 F.3d 721, 726 (7th Cir. 1998); Midwest Grinding, 976 F.2d at 1020; Graue Mill Dev. Corp. v. Colonial Bank & Trust Co., 927 F.2d 988, 992 (7th Cir. 1991). Therefore, to plead adequately a pattern of racketeering activity, a plaintiff must allege with particularity two predicate acts. See Goren, 156 F.3d at 728-29. The complaint must be specific with respect to the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations. See id. at 729; Midwest Grinding, 976 F.2d at 1020; Graue Mill, 927 F.2d at 992-93.
 
 
 24
 We agree with the district court that Mr. Lachmund's claim under sec. 1962(c) does not meet the heightened pleading requirements of Rule 9(b). The complaint alleges predicate acts of mail and wire fraud. However, only two paragraphs of the complaint advert to such fraudulent actions by ADMIS,[9] and neither satisfies Rule 9(b)'s requirement of particularity. Neither paragraph identifies the specific content of any alleged false representations or the identities of the parties to those alleged communications. Nor does either paragraph contain references to the specific times or places of these alleged misrepresentations. Absent these specifics, the pleadings cannot satisfy the requirements of Rule 9(b). Moreover, to the extent that the complaint claims that ADMIS violated sec. 1962(c) through the actions of its alleged agents, such a claim cannot survive dismissal under Rule 12(b)(6) because, as discussed above, Mr. Lachmund has not adequately pleaded agency between ADMIS and Gerlach, A/C, or A/C 2000. We therefore affirm the district court's dismissal of this claim.
 
 2.
 18 U.S.C. sec. 1962(d)
 
 25
 In Count II of his complaint, Mr. Lachmund alleges a conspiracy among ADMIS, A/C, and others in violation of 18 U.S.C. sec. 1962(d).[10] To state a claim for conspiracy under sec. 1962(d), a plaintiff must allege "(1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." Goren, 156 F.3d at 732 (footnote omitted). The complaint need not allege that each defendant agreed personally to commit two predicate acts but rather need only allege that each defendant agreed to "participate in an endeavor which, if completed, would constitute a violation of" RICO. Id. at 731--32.In Goren v. New Vision International, Inc., we affirmed the dismissal of the plaintiff's complaint because it failed to allege any "facts indicating an agreement by the [defendants] as to which roles they would play in the enterprise" or any agreement by the defendants that someone would commit two specific predicate acts on behalf of the enterprise. Id. at 732. Similarly in the case before us, Mr. Lachmund's complaint fails to allege with specificity any agreement among the defendants to participate in an endeavor that would constitute a violation of RICO. Paragraph 57 of the complaint states:
 
 
 26
 As set forth in the facts herein previously alleged, ADM . . . and A/C in violation of 18 U.S.C. sec. 1962(d), entered into a conspiracy to commit mail and wire fraud as a means of participating in the affairs of . . . Demeter, the CBOT and Plaintiff's farming operation, through a pattern of racketeering activity as defined by 18 U.S.C. sec. 1962(c).
 
 
 27
 R.48 at 26-27. However, nothing in that paragraph nor any other portion of the complaint pleads any facts indicating an act of agreement among the alleged conspirators or what roles the various defendants would play in the conspiracy.[11] The complaint also lacks any specific allegation that the defendants agreed to the commission (by someone) of two specific predicate acts in furtherance of the alleged conspiracy.[12] Absent such particular pleadings, Mr. Lachmund's complaint contains nothing more than "conclusory, vague and general allegations of a conspiracy" that are insufficient to state a claim under sec. 1962(d). Goren, 156 F.3d at 733. We therefore affirm the district court's dismissal of this claim.
 
 3.
 18 U.S.C. sec. 1962(a)
 
 28
 Mr. Lachmund alleges in Count III of his complaint that ADMIS and A/C violated sec. 1962(a).[13] To state a claim for the violation of sec. 1962(a), a plaintiff must plead "the receipt of income from a pattern of racketeering activity, and the use of that income in the operation of an enterprise." Vicom, 20 F.3d at 778 (quoting Morgan v. Bank of Waukegan, 804 F.2d 970, 972-73 (7th Cir. 1986)) (internal quotation marks omitted). As we indicated in our discussion of Mr. Lachmund's sec. 1962(c) claim, Mr. Lachmund has not adequately pleaded a pattern of racketeering activity. The district court was therefore correct to dismiss the claim for violation of sec. 1962(a).
 
 D. Commodity Exchange Act Claim
 1.
 
 29
 The CEA[14] prohibits transactions involving contracts for the purchase or sale of a commodity for "future delivery" unless such transactions are conducted on or subject to the rules of a board of trade designated by the CFTC as a "contract market" for that commodity. 7 U.S.C. sec. 6(a) (Supp. 1999). However, the CEA excludes from the definition of "future delivery" any "sale of any cash commodity for deferred shipment or delivery." Id. sec. 1a(11). Thus, contracts for the sale of a cash commodity for deferred shipment or delivery--commonly known as "cash forward contracts"--are exempt from regulation under the CEA. See Andersons, Inc. v. Horton Farms, Inc., 166 F.3d 308, 318 (6th Cir. 1998); CFTC v. Co Petro Marketing Group, Inc., 680 F.2d 573, 576-77 (9th Cir. 1982).
 
 
 30
 Cash forward contracts permit parties who contemplate the physical transfer of a commodity to guarantee themselves, prior to the time of delivery, a buyer (or a seller) at a particular price, even though convenience or necessity requires delayed delivery or shipment. See Andersons, 166 F.3d at 318; Co Petro, 680 F.2d at 577-78. The CEA's prohibition of off-exchange contracts for "future delivery" seeks to regulate not this type of contract for the actual physical transfer of a commodity, but instead transactions driven by price speculation. See Andersons, 166 F.3d at 318; Co Petro, 680 F.2d at 577-78 (tracing the cash forward exclusion back to Congress' enactment of the Future Trading Act of 1921, which exempted from regulation future delivery contracts made by owners and growers of grain). In Salomon Forex, Inc. v. Tauber, 8 F.3d 966 (4th Cir. 1993), cert. denied, 511 U.S. 1031 (1994), the Fourth Circuit explained:
 
 
 31
 Because the [CEA] was aimed at manipulation, speculation, and other abuses that could arise from the trading in futures contracts and options, as distinguished from the commodity itself, Congress never purported to regulate "spot" transactions (transactions for the immediate sale and delivery of a commodity) or "cash forward" transactions (in which the commodity is presently sold but its delivery is, by agreement, delayed or deferred). . . . Transactions in the commodity itself which anticipate actual delivery did not present the same opportunities for speculation, manipulation, and outright wagering that trading in futures and options presented. From the beginning, the CEA thus regulated transactions involving the purchase or sale of a commodity "for future delivery" but excluded transactions involving "any sale of any cash commodity for deferred shipment or delivery." 7 U.S.C. sec. 2. The distinction, though semantically subtle, is what the trade refers to as the difference between "futures," which generally are regulated, and "cash forwards" or "forwards," which are not.
 
 
 32
 Id. at 970-71.
 
 
 33
 In contrast to cash forward contracts, futures contracts are mechanisms used to shift price risk and generally do not contemplate or result in the physical transfer of the underlying commodity:
 
 
 34
 [A futures contract] is generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed. To facilitate the development of a liquid market in these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss. The main purpose realized by entering into futures transactions is to transfer price risks from suppliers, processors and distributors (hedgers) to those more willing to take the risk (speculators). Since the prices of futures are contingent on the vagaries of both the production of the commodity and the economics of the marketplace, they are particularly susceptible to manipulation and excessive speculation.
 
 
 35
 Id. at 971 (footnote omitted).
 
 
 36
 Mr. Lachmund's claim for violations of the CEA is premised on the conclusion that the HTA contracts between him and Demeter are off- exchange futures contracts and not cash forward contracts exempt from the CEA. Although cash forward contracts and futures contracts are easily distinguishable in theory, it is frequently difficult in practice to tell whether a particular arrangement between two parties is a bona fide cash forward contract for the delivery of grain or whether it is a mechanism for price speculation on the futures market. Our task, therefore, is to establish a methodology for determining whether a particular contract is a cash forward contract exempt from regulation under the CEA or a futures contract subject to the requirements of the CEA.[15] We then must apply that test to the facts of the case before us to determine whether Count IV of Mr. Lachmund's complaint states a claim for violation of the CEA.
 
 2.
 
 37
 In determining whether a contract is a cash forward contract or a futures contract, our starting point must always be the words of the contract itself. The contract's terms will provide several indications of the nature of the transaction it memorializes. The document itself will reveal whether the agreement contemplates actual delivery, by indicating the following: whether the parties to the contract are in the business of producing or obtaining grain; whether the parties are capable of delivering or receiving actual grain in the quantities provided for in the contract; whether there is a definite date of delivery; whether the agreement explicitly requires actual delivery, as opposed to allowing delivery obligations to be rolled indefinitely into the future; whether payment takes place only upon delivery; and whether the contract's terms are individualized, as opposed to standardized. See CFTC Interpretive Statement, Characteristics Distinguishing Cash and Forward Contracts and "Trade" Options, 50 Fed. Reg. 39,656, 39,658 (1985); see also Andersons, 166 F.3d at 320 (citing In re Grain Land Coop., 978 F. Supp. 1267, 1273-74 (D. Minn. 1997)); Co Petro, 680 F.2d at 578.
 
 
 38
 This list of factors characterizing cash forward contracts, however, is neither exhaustive nor definitive. Indeed, because the CEA regulates transactions, it is often necessary to look beyond the written contract. See Andersons, 166 F.3d at 319-20 (cautioning that "self-serving labels" that parties place on their contracts are not dispositive on the issue whether a contract is a cash forward contract or a futures contract); Co Petro, 680 F.2d at 581 (noting that "no bright-line definition or list of characterizing elements is determinative"). In order to gain the fullest understanding possible of the parties' agreement and their purpose, we often must consider the course of dealings between the parties and the totality of the business relationship. See id. ("The transaction must be viewed as a whole with a critical eye toward its underlying purpose.").
 
 
 39
 We note that the CFTC--the agency charged with administering the CEA--advocates such an approach that considers the totality of the circumstances. See Amicus Br. at 4 ("[A] court must look beyond the four corners of a written agreement and take into account all relevant circumstances in deciding the issue of the underlying nature of the transaction."); see also CFTC Interpretive Statement, Characteristics Distinguishing Cash and Forward Contracts and "Trade" Options, 50 Fed. Reg. 39,656, 39,657 (1985) (noting that both courts and the Commission "have required that the contract's terms and the parties' practice under the contract" indicate that both the buyer and seller deal in and contemplate future delivery of the actual commodity (emphasis added)); see also id. at 39,658 (noting that "the courts and the Commission have examined whether the parties to the contracts are commercial entities that have the capacity to make or take delivery and whether delivery, in fact, routinely occurs under such contracts" (emphasis added)). Other courts have adopted a similar approach, looking not only at the characteristics of the contracts themselves but also at the history of dealings between the parties. See, e.g., Andersons, 166 F.3d at 320 (including as a consideration whether "delivery and payment routinely occurred between the parties in past dealings"); Co Petro, 680 F.2d at 581; Farmers Co-op. v. Lambert, No. LACV305569, 1999 WL 177473, at *12 (Iowa Dist. Ct. 1999) ("Past actual delivery patterns and course of dealing between the parties are relevant . . . .").
 
 3.
 
 40
 With these principles in mind, we turn now to the facts in the case before us. We begin by examining the terms of the HTA contracts between Mr. Lachmund and Demeter. First, the contracts, on their faces, clearly contemplate the actual delivery of grain. Several terms, which appear in each HTA contract, indicate that the purpose of each agreement is the physical transfer of actual grain (or soybeans): Term 4 governs the circumstance in which the grain delivered is of an improper grade or is out of condition or unmerchantable; term 5 governs the time of shipment; term 6 allows the buyer to route the grain to an alternate destination if it is unable to receive the grain at the time of delivery; term 7 allows the seller to fulfill the contract requirements with not only grain from his own production but also grain from a different source; term 9 requires that the grain delivered conform to Pure Food and Drug regulations; term 10 requires the seller to warrant that the grain is free and clear of all liens; and the payment term provides that payment will be made "upon delivery and pricing." These terms clearly contemplate actual delivery, rather than mere speculation on price movements in the market for grain.
 
 
 41
 Second, it is undisputed that the parties to the contract are in the business of producing or obtaining grain. The seller, Mr. Lachmund, is a farmer who produces corn and soybeans; the buyer, Demeter, operates a grain elevator. Moreover, the parties are reasonably capable of delivering or receiving actual grain in the quantities provided for in the contract. Mr. Lachmund's complaint avers that the grain quantities in the contracts were based on his estimated annual crop yield.[16] Therefore, it cannot be said that, although the parties are in the business of producing and buying grain, the contract quantities are so much greater than the parties' capacities that the contract, on its face, must not contemplate actual delivery. See Lambert, 1999 WL 177473, at *10.
 
 
 42
 Third, the contracts provide a definite time of delivery.[17] For example, the May 1995 corn contract provided for delivery in October 1995; the February 1996 corn contract provided for delivery in October 1996. The soybean contracts similarly provided for specific times of delivery. The terms of the contracts also require actual delivery and do not allow delivery obligations to be rolled to a future date, let alone rolled indefinitely into the future. Term 5 provides:
 
 
 43
 It is expressly understood that the grain herein mentioned is to be shipped as specified and be bought in or canceled only at the option of the buyer. The time of shipment can be extended by the buyer only. When grain is not shipped within specified time, this contract remains in force until the grain is shipped, or the contract canceled by the buyer.
 
 
 44
 Although a section labeled "remarks" in each contract states that "if buyer and seller mutually agree, they may continue to amend this contract until" a specific date subsequent to the delivery date, no term explicitly allows rolling of any kind.
 
 
 45
 Finally, the contracts are individualized with respect to such terms as the quantity of grain, the grade and type of grain, the time of delivery, the point of delivery, and which weights and grades will govern.
 
 
 46
 The HTA contracts, on their faces, contain all of the features characteristic of a cash forward contract for the physical transfer of actual grain. The contracts' terms contemplate actual delivery of the grain and reflect the parties' intention and purpose to buy and sell grain rather than to engage in price speculation on the futures market.
 
 
 47
 The contract terms, however, do not end our inquiry. Mr. Lachmund alleges that the parties engaged in a course of dealing not reflected in the written contracts that indicates a purpose other than the purchase and sale of actual grain. Mr. Lachmund's complaint alleges that the contracts' speculative nature is apparent from the parties' course of dealings outside of the contracts' written terms: The farmers could engage in unlimited rolling of their delivery obligations, and the contracts could be settled by a cash buy-out at any time.
 
 
 48
 As to whether parties engaged in a course of dealing that allowed unlimited and indefinite rolling of delivery obligations, Mr. Lachmund's own pleadings contradict this allegation. Although he avers that he and Demeter agreed to several rolls outside of the original terms of the contract,[18] he also alleges that Demeter refused, in May or June of 1996, to allow continued rolling across crop years and demanded settlement of the contracts. It is thus clear that the parties did not engage in a course of dealing consisting of unlimited and indefinite rolling of delivery obligations to the point where it can be said that no actual delivery obligation existed.
 
 
 49
 Mr. Lachmund also alleges that Demeter, in practice, did not require delivery but would instead accept a cash buy-out in lieu of delivery. In reviewing a dismissal under Rule 12(b)(6), we must assume that this allegation is true. However, even if true, Demeter's willingness to settle the contracts by cash buy- out is not sufficient, in light of all the other facts discussed above, to establish that no delivery obligation existed or that the fundamental, underlying purpose and intention of the parties was anything other than the physical delivery of actual grain. Under the contract, Demeter retained the right to cancel the contract if the grain was not shipped in time. It stands to reason that Demeter would agree to cancel a contract that the seller could not perform only on the condition that the seller pay Demeter, through a cash buy-out, the damages Demeter would suffer in finding an alternate source of grain to replace the undelivered amounts.
 
 
 50
 In sum, Mr. Lachmund's pleadings concerning the parties' course of dealing are insufficient to overcome the written contracts' unambiguous character as cash forward contracts for the transfer of grain. We hold, therefore, that the HTA contracts at issue in this case are cash forward contracts exempt from the purview of the CEA and that, accordingly, Count IV of Mr. Lachmund's complaint does not state a claim for violations of the CEA.
 
 Conclusion
 
 51
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 AFFIRMED
 
 
 Notes:
 
 
 [1]
 An IB may solicit commodity customer accounts and introduce those accounts to a Futures Commission Merchant such as ADMIS. ADMIS executed a Guarantee Agreement on behalf of A/C. By this agreement, ADMIS guaranteed the performance of, and agreed to be jointly and severally liable for, all obligations of A/C under the Commodity Exchange Act and its rules and regulations.
 
 
 [2]
 Mr. Lachmund entered into an HTA contract with Demeter in May 1995 for 125,000 bushels of corn, the total estimated yield of Mr. Lachmund's 1995 corn crop, for delivery in October 1995. In February 1996, he entered another HTA for 114,000 bushels of corn for delivery in October 1996. He also entered into four additional HTAs with Demeter for soybeans. In the years prior to entering these contracts, Mr. Lachmund had sold grain to Demeter pursuant to other contracts with Demeter.
 
 
 [3]
 The court denied dismissal of the state law fraud claim against A/C but then declined to retain supplemental jurisdiction over that claim and the other remaining state law claims. In denying dismissal of the fraud claim against A/C, the court held that Mr. Lachmund's complaint pleaded fraud with adequate particularity under Federal Rule of Civil Procedure 9(b) and that the complaint pleaded sufficiently that Gerlach was acting as the agent of A/C-A/C 2000 to prevent dismissal of the claim.
 
 
 [4]
 We address in the next section whether or not allegations of agency in the context of a fraud claim are subject to heightened pleading requirements.
 
 
 [5]
 Rule 8(a) provides:
 (a) Claims for Relief. A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross- claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.
 Fed. R. Civ. P. 8(a).
 
 
 [6]
 Rule 9(b) provides:
 (b) Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.
 Fed. R. Civ. P. 9(b).
 
 
 [7]
 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure sec. 1296, at 580 (2d ed. 1990).
 
 
 [8]
 18 U.S.C. sec. 1962(c) provides:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 
 
 [9]
 Paragraph 58 of the amended complaint states:
 ADM[IS] sent confirmations, monthly statements and other commodity futures contracts purchased through the mail and sold on the CBOT to offset the various HTA and other hybrid grain contracts solicited by . . . A/C . . . and Demeter. ADM[IS] through its co- conspirator agents used the mails to entice farmers other than Plaintiff to attend various "presentations" intended to lure them into this fraudulent scheme.
 R.48 at 24-25.
 Paragraph 61 of the amended complaint alleges:
 ADM[IS] made use of interstate telephone transmission lines to effectuate the commodity futures contracts purchased and sold on the CBOT to offset the various hybrid grain contracts solicited by . . . A/C . . . and Demeter. In addition, ADM[IS] caused the use of interstate telephone lines by A/C and Demeter to solicit hedge-to-arrive and other hybrid grain contracts with Plaintiff.
 R.48 at 25.
 
 
 [10]
 18 U.S.C. sec. 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."
 
 
 [11]
 In paragraphs 22 through 32 of the complaint, Mr. Lachmund does make various allegations concerning the purpose and methodology of the alleged conspiracy and the facts within the knowledge of the alleged conspirators. However, even these allegations refer only generally to actions by "the conspirators" and do not specify what roles or objectives or predicate acts were agreed to by any of the defendants.
 
 
 [12]
 As the district court pointed out, the complaint contains no allegation that ADMIS knew of or agreed to Gerlach's alleged fraudulent inducement of Mr. Lachmund to enter into contracts with Demeter and to make a trade in an ADMIS account. Moreover, the complaint lacks any allegation that A/C or A/C 2000, which Mr. Lachmund claims are a single entity, specifically agreed with ADMIS or anyone else.
 
 
 [13]
 18 U.S.C. sec. 1962(a) provides, in part:
 It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
 
 
 [14]
 7 U.S.C. sec. 1 et seq.
 
 
 [15]
 At the invitation of the court, the CFTC filed a brief as amicus curiae. We therefore have proceeded with the advice of the agency charged with the administration of the statute.
 
 
 [16]
 Mr. Lachmund alleges that the speculative nature of the HTA contracts is evident from the fact that the defendants allowed and even encouraged farmers to enter into HTA contracts for grain quantities much greater than they could produce in a crop year. However, this allegation is contradicted by his allegation elsewhere in the complaint that the quantity terms in his HTA contracts with Demeter were based on his estimated annual crop yield, not some quantity that would be impossible for Mr. Lachmund to produce in a year.
 
 
 [17]
 Mr. Lachmund alleges in his complaint that the defendants' involvement in speculative activities is apparent from the fact that many HTAs did not specify a delivery date. However, this allegation, at least with respect to Mr. Lachmund's dealings with the defendants, is squarely contradicted by the contracts attached as exhibits to the complaint and answer. Each HTA contract between Mr. Lachmund and Demeter provided for a specific time of delivery.
 
 
 [18]
 We note that these rolls apparently occurred not in contravention of the contract terms but instead pursuant to written amendments to the contracts.