In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-3236 to 99-3240, 99-3513 to 99-3517

Dennis Nagel, et al.,

Plaintiffs-Appellants,

v.

ADM Investor Services, Inc., et al.,

Defendants-Appellees.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 96 C 2675, 2741, 2879, 2972, and 5215--
Frank H. Easterbrook, Judge.

Argued May 8, 2000--Decided June 7, 2000

 Before Posner, Chief Judge, and Bauer and Diane P.
Wood, Circuit Judges.

 Posner, Chief Judge.  This is another chapter in
the continuing saga of "flexible" or "enhanced"
hedge-to-arrive contracts (we'll call these "flex
HTAs"); for the earlier chapters see Lachmund v.
ADM Investor Services, Inc., 191 F.3d 777 (7th
Cir. 1999), and Harter v. Iowa Grain Co., No. 98-
3010, 2000 WL 426366 (7th Cir. Apr. 21, 2000), in
light of which we can be brief.

 The plaintiffs in these five consolidated cases
are farmers who entered into contracts to deliver
grain to grain elevators and other grain
merchants, the defendants, at a specified future
date. So far, we are describing an ordinary
forward (sometimes called "cash forward")
contract, a contract that provides for delivery
at some future date at the price specified in the
contract. Merrill Lynch, Pierce, Fenner & Smith,
Inc. v. Curran, 456 U.S. 353, 357 (1982). The
hedging feature that gives the HTA contract its
name comes from the fact that the contract price
is a price specified in a futures contract that
the merchant buys on a commodity exchange and
that expires in the month specified for delivery
under the merchant's contract with the farmer
(the HTA contract). This arrangement hedges the
merchant against price fluctuations between
signing and delivery. The merchant is "long" in

his contract with the farmer (the forward contract) in the sense that, if price rises, he's to the good, because the price was fixed earlier, in the contract, and so he bought the farmer's grain cheap. But if the price of grain falls, he's hurt, because he's stuck with a contract price that is higher than the current price. To offset this risk he goes "short" in the futures contract--that is, he agrees to sell an offsetting quantity of grain at the same price as fixed in the forward contract. If the price of grain falls during the interval between the signing of and delivery under the forward contract, though he loses on the forward contract, as we have seen, he makes up the loss in the futures contract, where he is the seller and therefore benefits when the market price falls below the contract price: The loss he would otherwise sustain as a result of having to resell the farmer's grain at a lower price than the price fixed in his contract with the farmer is offset by his profit on the futures contract. In sum, the price in the contract between farmer and merchant fixed by reference to the futures contract made by the merchant protects the farmer against price fluctuations between the signing of the contract and the delivery of the grain (just because it is a fixed price and so is unaffected by any change in market price during this interval), while the futures contract itself protects the merchant from the risk of loss should the price plummet during that interval.

That's a simple HTA contract; the "flex" feature of the HTA contracts involved in this case comes from the fact that they allow the farmer to defer delivery of the grain. (On the difference between simple and flex HTAs, see the lucid discussion in Charles F. Reid, Note, "Risky Business: HTAs, The Cash Forward Exclusion and Top of Iowa Cooperative v. Schewe," 44 Vill. L. Rev. 125, 134-37 (1999).) Such a contract specifies a delivery date but allows the farmer, upon the payment of a fee and an appropriate adjustment in the price to reflect changed conditions, to defer delivery beyond that date. A farmer who exercises this deferral option is doing what is called "rolling the hedge." The merchant, if he wants to hedge against price fluctuations during the extended period of the contract, will close out his existing futures contract by buying an offsetting contract and will then buy a new futures contract to expire at the new delivery date. When the new delivery date arrives, the farmer can again roll the hedge.

Why might a farmer want to roll the hedge? If the market price rose between the signing of the original contract with the merchant and the delivery date specified in the contract, and the

farmer expected it to fall later, he could, by rolling the hedge, sell his grain at the current market price (since he wouldn't have to deliver it to the merchant), which by assumption is higher than the price fixed in the contract; and then, just before the new delivery date, he could buy at the then current price, expected to be lower, the amount of grain he was obligated to deliver and deliver it at the price fixed in the contract. The flex feature thus enables the farmer to speculate on fluctuations in the market price of his grain.

The plaintiffs did this in 1995, but unfortunately for them prices stayed up and to satisfy their contractual obligations they had to buy grain at prices above the prices fixed in their contracts with the merchants, sustaining large losses as a consequence. They seek in these suits to get out of the contracts by arguing that flex HTA contracts are futures contracts. The Commodity Exchange Act, 7 U.S.C. sec.sec. 1 et seq., requires that futures contracts be sold through commodity exchanges and the futures commission merchants registered on those exchanges, 7 U.S.C. sec. 6(a); the defendants fall into neither category. The section just cited declares futures contracts not sold through commodity exchanges and registered futures commission merchants unlawful, CFTC v. Topworth Int'l, Ltd., 205 F.3d 1107, 1114 (9th Cir. 1999); CFTC v. Noble Metals Int'l, Inc., 67 F.3d 766, 772 (9th Cir. 1995); CFTC v. Co Petro Marketing Group, Inc., 680 F.2d 573, 581 (9th Cir. 1982), and the parties assume that futures contracts rendered unlawful by section 6(a) are indeed unenforceable.

We cannot find any case that holds this, although several cases require disgorgement of profits obtained under unlawful such contracts, see id. at 582-84; CFTC v. American Metals Exchange Corp., 991 F.2d 71, 76 (3d Cir. 1993); CFTC v. American Board of Trade, Inc., 803 F.2d 1242, 1251-52 (2d Cir. 1986), and many cases say that contracts made in violation of law are unenforceable. E.g., Shlay v. Montgomery, 802 F.2d 918, 922 (7th Cir. 1986); MCA Television Ltd. v. Public Interest Corp., 171 F.3d 1265, 1280 n. 19 (11th Cir. 1999); Total Medical Management, Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir. 1997); Development Finance Corp. v. Alpha Housing & Health Care, Inc., 54 F.3d 156, 163 (3d Cir. 1995); Paul Arpin Van Lines, Inc. v. Universal Transportation Services, Inc., 988 F.2d 288, 290-91 (1st Cir. 1993); Resolution Trust Corp. v. Home Savings of America, 946 F.2d 93, 96 (8th Cir. 1991). The Supreme Court has stated flatly that "illegal promises will not be enforced in cases controlled by the federal law."

Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 77 (1982). Yet despite this ringing declaration, many cases continue to treat the defense of illegality to the enforcement of a contract as presumptive rather than absolute, forgiving minor violations and disallowing the defense to be used to confer windfalls. See U.S. Nursing Corp. v. Saint Joseph Medical Center, 39 F.3d 790, 792 (7th Cir. 1994); Olson v. Paine, Webber, Jackson & Curtis, Inc., 806 F.2d 731, 743 (7th Cir. 1986); Northern Indiana Public Service Co. v. Carbon County Coal Co., 799 F.2d 265, 273 (7th Cir. 1986); Lulirama Ltd. v. Axcess Broadcast Services, Inc., 128 F.3d 872, 880 (5th Cir. 1997); E. Allan Farnsworth, Contracts sec. 5.5, pp. 344-46 (3d ed. 1999). (U.S. Nursing Corp. and Lulirama are cases under state law, but the others we have cited are federal-law cases.) In light of the defendants' concession we need not pursue the question how far or in what circumstances the fact that a contract was found to have been made in violation of the Commodity Exchange Act would absolutely bar any relief to the victim of the breach of such a contract.

The Act defines a futures contract as a contract for future delivery, but defines future delivery to exclude "any sale of any cash commodity for deferred shipment or delivery," 7 U.S.C. sec. 1a(11), that is, any forward contract. Lachmund v. ADM Investor Services, Inc., supra, 191 F.3d at 787. The plaintiffs argue that since the flex feature of their contracts permits delivery to be deferred indefinitely, the contracts are not forward contracts, but instead futures contracts. The district court disagreed and dismissed the suits, believing it plain that the language of the contracts showed they were forward contracts. Some of them contain arbitration clauses, so in addition to dismissing the suits the court confirmed arbitral awards for the defendants for the plaintiffs' breaches of contract in failing to make delivery when due. 65 F. Supp. 2d 740 (N.D. Ill. 1999).

Although futures contracts specify delivery as a possible method of satisfying the short's obligations, it is much more common for such contracts to be closed out by the "buyer's" taking an offsetting position in a new contract identical but for its price. Dunn v. CFTC, 519 U.S. 465, 472 (1997); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, supra, 456 U.S. at 359 n. 18 (only 3 percent closed out by delivery); Salomon Forex, Inc. v. Tauber, 8 F.3d 966, 971 (4th Cir. 1993); Cargill, Inc. v. Hardin, 452 F.2d 1154, 1156 n. 2 (8th Cir. 1971) (fewer than 1 percent closed out by delivery); Reid, supra, 44 Vill. L. Rev. at 129 n. 27. This option for getting out enables people who are not

agriculturalists, and wouldn't know an ear of corn from a soybean if it slapped them in the face, to speculate in the prices of commodities. In other words, these contracts are really a type of security, like common stock, rather than a means of fixing the terms by which farmers ship their output to grain elevators and other agricultural middlemen. It is because commodity-futures contracts are a type of security that Congress has seen fit to subject them to a regulatory scheme, the Commodity Exchange Act, which parallels that administered by the SEC for trading in corporate stock. There was no intention of regulating the commerce in agricultural commodities itself. But because futures contracts do contain a provision for delivery as an optional mode of compliance with obligations created by such contracts, rare as the exercise of that option is, it isn't always easy to determine just from the language of a contract for the sale of a commodity whether it is a futures contract or a forward contract.

The flex feature in the HTA contracts moves these contracts in the direction of futures contracts by attenuating the obligation to deliver, and there is anxiety that by loading such features onto what would otherwise seem to be garden-variety forward contracts the regulatory scheme will be evaded. This led our court in the Lachmund case to look with favor upon a "totality of the circumstances" approach for determining whether a contract is a futures contract or a forward contract, 191 F.3d at 787–88, as have other courts as well. See Grain Land Coop v. Kar Kim Farms, Inc., 199 F.3d 983, 991 (8th Cir. 1999); Andersons, Inc. v. Horton Farms, Inc., 166 F.3d 308, 317–21 (6th Cir. 1998); CFTC v. Co Petro Marketing Group, Inc., supra, 680 F.2d at 579–81. But as noted by Judge Easterbrook, also a member of this court though sitting by designation as the trial judge in this case, the "totality of the circumstances" approach invites criticism as placing a cloud over forward contracts by placing them at risk of being reclassified as futures contracts traded off-exchange and therefore illegal. Of course, if the legality of a contract cannot easily be determined in advance, that might be a factor rebutting the presumption noted earlier that illegal contracts are unenforceable; but this is not a possibility that we need consider in this case, or perhaps in any flex HTA case, since the problem of legal uncertainty under the "totality of circumstances" is less serious than it appears to be.

As is often true of multifactor legal tests, the "totality of circumstances" approach turns out in practice to give controlling significance to a

handful of circumstances; and fortunately they can usually be ascertained just by reading the contract. The cases indicate that when the following circumstances are present, the contract will be deemed a forward contract (see Lachmund v. ADM Investor Services, Inc., supra, 191 F.3d at 788-90; Grain Land Coop v. Kar Kim Farms, Inc., supra, 199 F.3d at 990-92; Andersons, Inc. v. Horton Farms, Inc., supra, 166 F.3d at 317-22; CFTC v. Noble Metals Int'l, Inc., supra, 67 F.3d at 772-73; CFTC v. Co Petro Marketing Group, Inc., supra, 680 F.2d at 579-81; Top of Iowa Coop. v. Sime Farms, Inc., 608 N.W.2d 454, 465 (Iowa 2000)):

 (1)  The contract specifies idiosyncratic terms regarding place of delivery, quantity, or other terms, and so is not fungible with other contracts for the sale of the commodity, as securities are fungible. But there is an exception for the case in which the seller of the contract promises to sell another contract against which the buyer can offset the first contract, as in In re Bybee, 945 F.2d 309, 313 (9th Cir. 1991), and CFTC v. Co Petro Marketing Group, Inc., supra, 680 F.2d at 580. That promise could create a futures contract.

 (2)  The contract is between industry participants, such as farmers and grain merchants, rather than arbitrageurs and other speculators who are interested in transacting in contracts rather than in the actual commodities.

 (3)  Delivery cannot be deferred forever, because the contract requires the farmer to pay an additional charge every time he rolls the hedge.

 As long as all three features that we have identified are present, eventual delivery is reasonably assured, unlike the case of a futures contract--and remember that the Commodity Exchange Act is explicit that a contract for delivery in the future is not a futures contract. If one or more of the features is absent, the contracts may or may not be futures contracts.

 This refinement of the "totality of circumstances" approach that we adopt today, while it will not resolve every case, will protect forward contracts from the sword of Damocles that these plaintiffs wish to wave above the defendants' heads, yet at the same time will prevent evasion of the Commodity Exchange Act by mere clever draftsmanship.

 The three features are present here, as can be ascertained from the contracts themselves; and while the plaintiffs allege that there are oral

as well as written terms in some of the contracts with the defendants, they have not alleged any oral terms that would prevent eventual delivery or cancel the fee for rolling, which places a practical limit on how long delivery can be deferred. The district court was therefore correct to dismiss the plaintiffs' complaint, and we proceed to the question whether the court was also correct to confirm the arbitration awards in favor of the grain merchants.

For the reasons stated in Harter, a materially identical case, we think the court was correct. But there is an issue not addressed in Harter that may repay discussion, although it turns out to be academic. A regulation promulgated under the Commodity Exchange Act, 17 C.F.R. sec. 180.2; see id. sec. 180.3(b)(7), imposes certain procedural formalities on arbitrations under the Act, such as a right to cross-examine witnesses, that are not found in the Federal Arbitration Act, under which the awards challenged by the plaintiffs were confirmed. The defendants point out that the regulation is limited to disputes arising under the Commodity Exchange Act, which a dispute concerning a forward contract does not arise under; that Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 402-04 (1967), makes the validity of a contract that contains an arbitration clause itself an arbitrable issue (the issue here, of course, is whether these are forward or futures contracts), see Hammes v. AAMCO Transmissions, Inc., 33 F.3d 774, 783 (7th Cir. 1994); Colfax Envelope Corp. v. Local No. 458-3M, 20 F.3d 750, 754-55 (7th Cir. 1994); Europcar Italia, S.p.A. v. Maiellano Tours, Inc., 156 F.3d 310, 315 (2d Cir. 1998); and that the plaintiffs' argument that the contracts in issue are invalid by virtue of being subject to the Act is a validity challenge that the arbitrators resolved against them by holding that these are forward contracts.

The plaintiffs reply that if the parties to a contract are free to establish a bobtailed arbitration procedure for determining the contract's validity, the Act will be circumvented. But the inapplicability of the regulation to arbitral determinations of validity did not make the arbitration procedurally inadequate. It just meant it was governed by the Federal Arbitration Act, which establishes procedural minima deemed adequate to enable arbitrators to make responsible decisions on issues of validity. 9 U.S.C. sec. 10; Harter v. Iowa Grain Co., supra, 2000 WL 426366 at *8; Flexible Mfg. Systems Pty. Ltd. v. Super Products Corp., 86 F.3d 96, 99 (7th Cir. 1996); Dawahare v. Spencer, No. 98-6356, 2000 WL 489712, *2 (6th Cir. Apr. 27, 2000); Morani v. Landenberger, 196

F.3d 9, 11-12 (1st Cir. 1999); Scott v. Prudential Securities, Inc., 141 F.3d 1007, 1015-17 (11th Cir. 1998); Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16, 20 (2d Cir. 1997). Anyway we earlier in this opinion resolved the issue of validity against the plaintiffs who did not have arbitration clauses in their contracts, which renders academic the question whether the arbitrators were entitled to resolve the issue: if they were not, we were, and we come to the same resolution of it.

The only other issue that merits discussion is whether the district court was premature in denying class certification; it was not. As is often and puzzlingly the case, see Amati v. City of Woodstock, 176 F.3d 952, 957 (7th Cir. 1999); Frahm v. Equitable Life Assurance Society, 137 F.3d 955, 957 (7th Cir. 1998); Bieneman v. City of Chicago, 838 F.2d 962, 964 (7th Cir. 1988) (per curiam), the plaintiffs, who lost in the district court and could not, in light of Lachmund and Harter, rationally rate their chances of a reversal high, are arguing for class treatment, even though that will extinguish the claims of all members of the class who do not opt out, Robinson v. Sheriff of Cook County, 167 F.3d 1155, 1157-58 (7th Cir. 1999); Pabst Brewing Co. v. Corrao, 161 F.3d 434, 439 (7th Cir. 1998), while the defendants are arguing against class treatment, though if the argument prevails the res judicata effect of a judgment in their favor will be curtailed.

In any event, we do not find persuasive the plaintiffs' argument, perfunctorily made, that the district court could not deny class status on its own initiative without giving the plaintiffs a chance to introduce evidence concerning the suitability of the case to be a class action. The case had been pending for several years when the court ruled, and the plaintiffs had never during that period moved for class certification, even though Rule 23 of the Federal Rules of Civil Procedure and the cases interpreting it require that the issue of class certification be resolved as quickly after the suit is filed as practicable. Fed. R. Civ. P. 23(c)(1); Crawford v. Equifax Payment Services, Inc., 201 F.3d 877, 881 (7th Cir. 2000); Bennett v. Schmidt, 153 F.3d 516, 519-20 (7th Cir. 1998); Bieneman v. City of Chicago, supra, 838 F.2d at 963-64. Not only did the plaintiffs' counsel flout this precept, but they demonstrated to the district court's satisfaction that they were incapable of representing the class adequately. Fed. R. Civ. P. 23(a)(4); Amchem Products, Inc. v. Windsor, 521 U.S. 591, 626 n. 20 (1997); General Telephone Co. v. Falcon, 457 U.S. 147, 157 n. 13 (1982); Secretary of Labor v. Fitzsimmons, 805 F.2d 682,

697 (7th Cir. 1986) (en banc); Greisz v. Household Bank (Illinois), N.A., 176 F.3d 1012, 1013-14 (7th Cir. 1999); Marisol A. v. Giuliani, 126 F.3d 372, 378 (2d Cir. 1997) (per curiam).

It was apparent, moreover, both that each class member had a sufficiently large stake to be able to afford to litigate on his own--a consideration that weighs against allowing a suit to proceed as a class action, Amchem Products, Inc. v. Windsor, supra, 521 U.S. at 617; Frahm v. Equitable Life Assurance Society, supra, 137 F.3d at 957, in view of the well-known drawbacks of class litigation, In re Rhone-Poulenc Rorer Inc., 51 F.3d 1293, 1299-1300 (7th Cir. 1995)--and that, because the complaints alleged fraud, which is plaintiff-specific, issues common to all of the class members were not likely to predominate over issues peculiar to specific members, which is still another requirement of Rule 23 for class certification. See Fed. R. Civ. P. 23(b)(3); Amchem Products, Inc. v. Windsor, supra, 521 U.S. at 622-23; Frahm v. Equitable Life Assurance Society, supra, 137 F.3d at 957; Andrews v. AT&T Co., 95 F.3d 1014, 1023-24 (11th Cir. 1996); Castano v. American Tobacco Co., 84 F.3d 734, 744-45 (5th Cir. 1996).

Affirmed.