FARMERS ELEVATOR COMPANY OF OAKVILLE, INC., Estate of Tim Norris, Dan Bronnenberg, Rick Harter, Justin Day, Charles Whitehair, and J.B. Chapman, Appellants–Respondents,

v.

John A. HAMILTON, Appellee–Petitioner.

No. 18A04–0906–CV–347.

Court of Appeals of Indiana.

April 23, 2010.

---

Thomas M. Beeman, Anderson, IN, John H. Brooke, Douglas Mawhorr,

Brooke Mawhorr, Muncie, IN, Attorneys for Appellants.

Kurt A. Webber, Kurt A. Webber, P.C., Carmel, IN, Attorney for Appellee.

## MEMORANDUM DECISION

VAIDIK, Judge.

### Case Summary

The plaintiff farmer and defendant cooperative executed four hedge-to-arrive contracts for the sale of grain. Each contract stated a price, type, and quantity of grain to be delivered. None of the contracts specified a delivery date. The contracts also omitted rolling fees, but the farmer extended his delivery periods several times and was charged for each extension. The farmer ultimately did not deliver, and the contracts were cancelled. The farmer executed a series of promissory notes agreeing to compensate the co-op. He tendered a series of payments thereafter. The farmer then brought this action alleging, among other things, that the grain purchase agreements were unlawful and void "futures contracts." A jury found in his favor, and the co-op now appeals. We hold as a matter of law that the grain purchase agreements were valid and enforceable "forward contracts." We also hold that the applicable statutes of limitations barred the farmer's claim for breach of fiduciary duty and partially barred his claim for money had and received. We further clarify that the co-op did not waive its motions for judgment on the evidence by calling additional witnesses after the motions were denied by the trial court. We reverse and remand.

### Facts and Procedural History

Farmers Elevator Company of Oakville, Inc. ("FECO") was an agricultural cooperative that purchased grain from local farmers. John Hamilton was a farmer and former member of FECO's board of directors.

Hamilton and FECO entered into four hedge-to-arrive (HTA) contracts for the sale of grain. The contracts in question were executed on August 24, 1994, February 28, 1995, July 14, 1995, and November 24, 1995. Each was a form contract entitled, "PURCHASE CONTRACT." Appellants' App. p. 341–44. The four contracts stated that "Seller hereby sells and agrees to deliver and Buyer hereby purchases and agrees to receive upon the terms and conditions set forth below[.]" *Id.* The contracts then indicated the types and quantities of grain that Hamilton would deliver, moisture percentages, and the prices that FECO would pay. Prices were stated using Chicago Board of Trade crop terminology. The first contract was for 6000 bushels of "# 1 SRW Wheat" at a price of "WN95 $3.45." *Id.* at 342. The second contract called for 20,000 bushels of "# 2 Yellow Corn" at a price of "$2.58¼ CZ." *Id.* at 344. The third was for 50,000 bushels of "# 2 Yellow Corn" at a price of "CH 96 $2.93." *Id.* at 341. And the fourth called for 30,000 bushels of "# 2 Yellow Corn" at a price of "CH6 $3.3375." *Id.* at 343. Delivery dates were not specified. The contracts stated that "Seller has the option to roll this contract to a forward pricing month in the same crop year. _____ per bushel will be charged for this service.... The option month of this contract is _____." *Id.* The contracts further provided:

2. Every effort will be made by buyer to accept the grain covered by this contract as it is delivered....

3. Seller warrants that the grain to be delivered hereunder will be delivered free and clear of any and all claims, encumbrances, liens, and penalties.

\* \* \* \* \*

5. Any extension time is to be at buyer's sole option. . . .

6. Payment by buyer is conditioned upon seller's completion of delivery of total quantity as set forth above. . . .

\* \* \* \* \*

9. Grain sold hereunder must be of merchantable quality. Seller guarantees that the grain covered by this contract will meet the Federal Food, Drug and Cosmetic Act requirements.

*Id.*

Hamilton never delivered the grain in accordance with the contracts. Instead he extended the delivery period of each contract several times. He was charged a rolling fee of $0.01 per bushel for each extension. The rolling charges were memorialized in a series of form documents, each entitled, "CONFIRMATION OF ROLLING A HEDGE TO ARRIVE CONTRACT." *Id.* at 167–69, 171, 173–76, 178–81. Then in July 1996 all four contracts were cancelled. The cancellation terminated Hamilton's obligation to deliver the grain and fixed his liability under the contracts. Hamilton's liability totaled $234,465.

Over the next several years Hamilton signed a series of promissory notes in which he agreed to pay FECO the amount owed. On April 26, 2000, Hamilton paid FECO $12,750. On July 15, 2002, Hamilton paid $20,000. And on August 23, 2002, he tendered an additional $26,000.

In 2003 FECO's board of directors decided to sell the elevator. The board set up a meeting to vote on the proposed sale. Notices were sent to all members. Hamilton received notice, attended the meeting, and voted on the proposal. A majority of members voted to sell the cooperative.

The sale was completed on January 31, 2004.

FECO attempted to collect Hamilton's remaining debt after the elevator was sold. Hamilton made two payments to FECO in 2005 totaling $35,000. But on May 22, 2006, Hamilton initiated this lawsuit.

Hamilton brought a six-count complaint against FECO and its directors. Count I sought declaration that the HTA contracts and promissory notes were unenforceable. Count II sought recoupment of money had and received, namely the payments Hamilton made on his promissory notes. Count III sought dividends owed to Hamilton from the sale of FECO. Count IV alleged breach of fiduciary duty by FECO's board of directors in selling the FECO facility. Counts V and VI alleged conversion and criminal conversion of the foregoing monies and dividends. FECO denied Hamilton's allegations, pled the applicable statutes of limitations, and counterclaimed for breach of contract.

Hamilton's theory was, in part, that his grain contracts were speculative "futures contracts" that were unlawful and void. He argued that his promissory notes were thus not supported by valid consideration and that he should be able to reclaim all payments he had tendered to FECO. FECO's position was that the grain contracts were valid "forward contracts" which furnished consideration for the promissory notes.

The parties became involved in a contentious discovery dispute before trial. Hamilton sought various records related to FECO's asset sale. He was allegedly denied access to the documents, and at some point the requested records were missing.

In any event, the case was tried to a jury in May 2009. FECO moved for judgment on the evidence with respect to Counts II, IV, V, and VI after Hamilton's

case-in-chief. FECO argued that the claims for money had and received and breach of fiduciary duty were barred by their respective statutes of limitations. Hamilton responded that the limitations periods were tolled by the "continuing wrong" and "fraudulent concealment" doctrines. The trial court denied the motion and submitted the statutes of limitations and tolling issues to the jury. The court granted FECO's motion on Counts V and VI for conversion and criminal conversion.

After the ruling on its motion for judgment on the evidence, FECO called two witnesses to testify in connection with the discovery dispute that occurred before trial. The first witness was an attorney who had formerly represented FECO in the case. The second witness was a FECO representative who had handled the requested files and had been asked to retrieve them. Both witnesses were questioned only in regard to the missing discovery. FECO did not renew its motion for judgment on the evidence at the close of all evidence.

Before closing argument, FECO objected to proposed jury instructions on the validity and enforceability of Hamilton's HTA contracts. FECO argued that whether the contracts were enforceable was "a legal determination for the Court to decide rather than giving it to the jury...." Tr. p. 652. The trial court overruled the objection and instructed the jury as follows:

INSTRUCTION NO. 10: In Count 1 of the Complaint, Plaintiff, John Hamilton, has asked for a determination whether the hedge-to-arrive purchase contracts which Hamilton entered into with Farmer's Elevator are illegal, void or otherwise unenforceable. Hamilton has also asked for a determination whether the promissory notes that he signed were illegal, void, or otherwise unenforceable.

INSTRUCTION NO. 11: Under the Commodity Exchange Act, futures contracts speculating on the price of grain not sold through commodity exchanges and registered futures commission merchants are unlawful. However, the CEA does not prohibit contracts for the actual physical delivery of grain, which are termed forward contracts. Whether a particular contract is a forward contract or an unlawful futures contract must be determined from a totality of the circumstances. A contract will be deemed a forward contract if the following circumstances are present: one (1), the contract specifies customized terms regarding the place of delivery, quantity, or other terms, and so is not fungible with other contracts for the sale of the commodity, as securities are fungible; two (2), the contract is between industry participants, such as farmers and grain merchants, rather than speculators who are interested in transacting contracts rather than in actual commodities; and three (3), delivery cannot be deferred forever; e.g., the contract requires the farmer to pay an additional charge to roll. If any one (1) of these circumstances is not present, the contract is an unlawful futures contract.

INSTRUCTION NO. 12: If you find in your decision on Count I that the contracts between Plaintiff, John Hamilton, and Defendant, Farmers Elevator, were unlawful futures contracts, then you may find that Plaintiff, John Hamilton, had no obligation to pay Farmers Elevator any money under the contracts, the promissory notes, or the Settlement Agreement....

*Id.* at 696–98.

The jury found for Hamilton and rendered the following verdict:

We, the Jury, find in favor of John Hamilton and against Farmer's Elevator Company of Oakville, Inc. on the claim of John Hamilton and assess damages in the sum of $116,072.50.

We, the jury, find in favor of John Hamilton and against Tim Norris, Dan Bronnenberg, Rick Harter, Justin Day, Charles Whitehair, and J.B. Chapman, individually, jointly and severally with regard to John Hamilton's claim and assess damages in the sum of $0.00.

We, the jury, find in favor of John Hamilton and against Farmer's Elevator Company of Oakville, Inc. with regard to the Counterclaim.

Appellants' App. p. 24. FECO and its directors now appeal.

### Discussion and Decision

FECO raises several issues which we restate as follows: whether Hamilton's claims for money had and received and for breach of fiduciary duty were barred by their applicable statutes of limitations and whether the HTA contracts were valid agreements which furnished consideration for Hamilton's promissory notes. Hamilton raises a third issue which we address first: whether FECO waived review of its motions for judgment on the evidence by introducing additional evidence after the motions were denied.

### I. Alleged Waiver of Motions for Judgment on the Evidence

■ FECO pled the statutes of limitations in its answer to Hamilton's complaint and then raised the defenses at trial in its motions for judgment on the evidence. Hamilton argues that FECO waived review of its motions for judgment on the evidence by calling additional witnesses after the trial court ruled on the motions. FECO responds that it has not waived review, for although it offered further witness testimony after the motions were de-

nied, that testimony did not pertain to the issues presented in their motions for judgment on the evidence. FECO contends that "where the evidence submitted after denial of the motion had nothing to do with the motion, no waiver has occurred." Appellants' Reply Br. p. 6.

With some exceptions not relevant here, statutes of limitations are affirmative defenses which must be pled and proven and can be waived. See 51 Am.Jur.2d *Limitation of Actions* § 20 (2000); *cf. Ventura County v. Neice,* 434 N.E.2d 907, 912 (Ind. Ct.App.1982).

■ Indiana Trial Rule 50(A) provides: "Where all or some of the issues in a case tried before a jury ... are not supported by sufficient evidence ..., the court shall withdraw such issues from the jury and enter judgment thereon...." A motion for judgment on the evidence challenges the legal sufficiency of the evidence. *Kelly v. Levandoski,* 825 N.E.2d 850, 861 (Ind. Ct.App.2005), *trans. denied.* Judgment may be entered only if there is no substantial evidence or reasonable inference to be drawn therefrom to support an essential element of the non-movant's claim. *Town of Highland v. Zerkel,* 659 N.E.2d 1113, 1120 (Ind.Ct.App.1995), *trans. denied.*

A party may move for judgment on the evidence "after another party carrying the burden of proof or of going forward with the evidence upon any one or more issues has completed presentation of his evidence thereon." Ind. Trial Rule 50(A)(1). "A motion for judgment on the evidence made at one stage of the proceedings is not a waiver of the right of the court or of any party to make such motion on the same or different issues or reasons at a later stage ..., except that error of the court in denying the motion shall be deemed corrected by evidence thereafter offered or admitted." T.R. 50(A)(6).

Interpreting these latter provisions, "[w]e have held that when a defendant moves for a judgment on the evidence and then introduces evidence on his own behalf after the motion is denied, the defendant has waived any alleged error regarding the denial of the motion." *Newland Res., LLC v. Branham Corp.*, 918 N.E.2d 763, 770 (Ind.Ct.App.2009); *Davidson v. Bailey*, 826 N.E.2d 80, 87 n. 9 (Ind.Ct.App.2005); *Hartford Steam Boiler Inspection & Ins. Co. v. White*, 775 N.E.2d 1128, 1134 (Ind. Ct.App.2002), *reh'g denied, trans. denied.*

We believe the workings of Rule 50(A) are more nuanced than this statement reflects. The official commentary to subsection (A) states:

> A motion for a directed verdict made at the conclusion of evidence submitted by one of the parties was required to have been renewed at the conclusion of all the evidence under prior Indiana law. *Long v. Archer*, 1943, 221 Ind. 186, 46 N.E.2d 818. Although this doctrine is not continued by the new rule, the practice is wise because evidence admitted after a motion for a directed verdict (now, judgment on the evidence) is made may correct the error of the court in overruling the motion, as provided in the last sentence of this subdivision.

1970 Civil Code Study Commission Comments, *reprinted in* 3 William F. Harvey, *Indiana Practice: Rules of Procedure Annotated* 459 (3d ed. 2002). Rule 50(A)'s advisory notes clarify that a motion for judgment on the evidence need not be renewed after presentation of all the evidence, but that the practice is "wise" because evidence introduced after the motion "may correct" the error of the court in denying it.

■ We therefore understand Rule 50(A) to operate as follows: if a defendant unsuccessfully moves for a judgment on the evidence at the close of the plaintiff's case-in-chief, presents his own additional evidence thereafter, but renews his motion at the conclusion of all evidence, the motion is preserved in the traditional sense and is reviewed in light of only the evidence introduced during the plaintiff's case-in-chief. This explains why it is advantageous for the defendant to renew the motion. Where the defendant moves for judgment on the evidence at the close of the plaintiff's case-in-chief, presents his own evidence thereafter, but fails to renew the motion at the conclusion of all evidence, the motion is not completely "waived," because renewal is not a requirement under Rule 50. However, the motion must be reviewed in light of all evidence presented during the trial, because any evidence offered by the defendant may cure an otherwise erroneous denial of his motion for judgment on the evidence. Appellate review of the motion essentially becomes review for sufficiency of the evidence. *Cf. Wolfe v. Estate of Custer ex rel. Custer*, 867 N.E.2d 589, 595 (Ind.Ct.App. 2007), *trans. denied; Davidson*, 826 N.E.2d at 87.

■ Where the moving party's additional evidence pertains to collateral matters irrelevant to the issues raised in the motion for judgment on the evidence, the analyses will not differ—that is, if the evidence introduced following the motion does not affect the directed verdict calculus, a review for overall sufficiency of the evidence will be akin to a review of the midtrial motion for judgment on the evidence. So when FECO argues that "no waiver has occurred" so long as "the evidence submitted after denial of the motion had nothing to do with the motion," we disagree with the semantics but agree with the underlying notion. Presenting additional evidence that has no bearing on a denied motion for directed verdict should generally not affect appellate review of the motion.

Here FECO moved for judgment on the evidence with respect to Hamilton's claims for money had and received and for breach of fiduciary duty. FECO argued that the claims were barred by their respective statutes of limitations. The motion was denied. FECO then called two additional witnesses to testify in regard to a pretrial discovery dispute. FECO did not renew its motion at the close of all evidence. In line with the foregoing, we conclude that FECO did not waive its motion by presenting additional evidence after the motion was denied by the trial court. But since FECO failed to renew its motion at the close of all evidence, we must technically review the motion considering any additional testimony adduced after it was denied. Of course FECO's additional witnesses only offered testimony on the discovery issue, but to the extent they may have furnished any evidence pertinent to the statute of limitations arguments, we must consider that evidence in connection with our analysis as well.

## II. Statutes of Limitations

### A. Claim for Money Had and Received

FECO's motion for judgment on the evidence alleged that Hamilton's claim for money had and received was in part barred by the applicable three-year statute of limitations. FECO contended that three of the five promissory note payments Hamilton sought to recoup had been tendered outside the limitations period. Hamilton responded that his claim was not time-barred because FECO's attempts to obtain Hamilton's money were part of one "continuing violation." Hamilton argued that he "was getting shaken down for payments over time, and certainly if some of his payment occurred after and some of them occurred before and it all relates to the same violation, the attempted enforcement of an unenforceable HTA, this too is something that should go to the jury." Tr.

p. 601. The trial court denied FECO's motion and instructed the jury that "[i]f an original violation of a duty has occurred beyond a period of limitation, but is closely related to other violations that are not time-barred, then recovery may be had for all violations on the theory that they are part of one (1), continuing violation." *Id.* at 700.

■ Hamilton's claim here was to recoup "money had and received." An action for money had and received

> is an equitable remedy that lies in favor of one person against another, when that other person has received money either from the plaintiff himself or third persons, under such circumstances that in equity and good conscience he ought not to retain the same, and which money ... belongs to the plaintiff, and where money has been received by mistake of facts or without consideration, or upon a consideration that has failed, it may be recovered back. Such an action rests upon an implied promise and may be maintained against the person who received money from the plaintiff under circumstances which in equity and good conscience he should not retain.

*Lawson v. First Union Mortgage Co.,* 786 N.E.2d 279, 283–84 (Ind.Ct.App.2003).

■ "[A]n action ... for conversion of an instrument, for money had and received, or like action based on conversion ... must be commenced within three (3) years after the cause of action accrues." Ind.Code § 26–1–3.1–118(g). Some statutes of limitations are subject to the discovery rule, which provides that "a cause of action accrues when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the act of another." *UNR–Rohn, Inc., a Div. of UNR Indus., Inc. v. Summit Bank of*

*Clinton County,* 687 N.E.2d 235, 240 (Ind. Ct.App.1997), *trans. denied.* However, this Court has held that the discovery rule does not apply under Section 26–1–3.1–118(g). *Auto–Owners Ins. Co. v. Bank One,* 852 N.E.2d 604, 611–12 (Ind.Ct.App. 2006), *vacated on other grounds,* 879 N.E.2d 1086 (Ind.2008). *Auto–Owners* involved an employee Wulf who took a series of checks from the plaintiff company, fraudulently endorsed them, and deposited them at the defendant bank in 1991. 852 N.E.2d at 608. Auto–Owners discovered the theft in 1998 and brought claims against Bank One for negligence and conversion. *Id.* at 607. Bank One invoked the three-year statute of limitations under Section 26–1–3.1–118(g). *Id.* at 609. Auto–Owners argued that the discovery rule tolled the limitations period. *Id.* at 610. We explained that while counterpart statutes expressly incorporated the discovery rule, Section 26–1–3.1–118 did not. *Id.* We concluded that the discovery rule did not apply under Section 26–1–3.1–118, and therefore "[a]ny cause of action Auto–Owners may have had accrued at the time each check was negotiated by Wulf." *Id.* at 612.

■ We likewise conclude that where a plaintiff seeks recoupment of money had and received based on payments made to the defendant, his cause of action accrues at the time the payments are made irrespective of his knowledge or discovery of injury. *See also Tanglewood Terrace, Ltd. v. City of Texarkana,* 996 S.W.2d 330, 337 (Tex.Ct.App.1999) ("A cause of action for money had and received accrues when money is paid."); *Angelini v. Delaney,* 156 Or.App. 293, 966 P.2d 223, 229 (1998) ("[I]t is generally accepted that a claim for money had and received accrues, and the statute of limitations begins to run, when the party against whom the claim is asserted receives payment.").

■ Hamilton tendered his first payment to FECO on April 26, 2000. He paid FECO again on July 15, 2002, and for a third time on August 23, 2002. Hamilton's causes of action for money had and received accrued when he remitted each of these payments. Hamilton did not file his complaint until May 22, 2006. Accordingly, Hamilton's claim for money had and received based on these three sums is time-barred by the three-year statute of limitations.

Hamilton maintains that a jury could have concluded FECO "attempted to collect a debt predicated upon unenforceable HTA contracts over a span of years prompting involuntary payment that, in equity, should be returned to Hamilton because of [FECO's] continuing, long-standing misconduct." Appellee's Br. p. 36. "Farmers relentlessly attempted to collect on its unlawful contracts." *Id.* "If [FECO's] original violation ... occurred beyond the period of limitation, but was closely related to other violations that are not time-barred, then Hamilton could recover for all violations on the theory that they are part of one, continuing violation." *Id.*

The doctrine of "continuing wrong" is applicable where an entire course of conduct combines to produce an injury. *Boggs v. Tri–State Radiology, Inc.,* 730 N.E.2d 692, 699 (Ind.2000). When this doctrine attaches, the statute of limitations does not begin to run until the wrongful act ceases, and at that point the plaintiff may bring the claim within the normal statutory period. *Id.* In order to apply the doctrine, the plaintiff must demonstrate that the alleged injury-producing conduct was of a continuous nature. *Johnson v. Blackwell,* 885 N.E.2d 25, 31 (Ind. Ct.App.2008).

We are aware of no authority, however, standing for the proposition that the con-

tinuing wrong doctrine applies to claims for money had and received. Even if the doctrine applied, the evidence does not support that FECO engaged in a continuous course of conduct which produced Hamilton's injury. The allegedly unenforceable HTA contracts were cancelled by July 1996. Afterward FECO only sought to collect the debt it believed it was owed.

We conclude that the trial court erred by denying FECO's motion for judgment on the evidence with respect to Hamilton's first three payments and by submitting the statute of limitations and "continuing wrong" issues to the jury.

*B. Claim for Breach of Fiduciary Duty*

FECO's motion for judgment on the evidence also alleged that Hamilton's breach of fiduciary duty claim was barred by the applicable two-year statute of limitations. Hamilton responded that the claim was not untimely because the limitations period was tolled by FECO's fraudulent concealment. The trial court instructed the jury that "[u]nder Indiana law, if a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at any time within the period of limitation after the discovery of the cause of action." Tr. p. 704.

█ A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary. *See* 37 Am.Jur.2d *Fraud and Deceit* § 31 (2001). Hamilton's breach of fiduciary duty claim alleged that FECO's directors "authorized the enforcement of the HTA Contracts knowing the same to be illegal, void, or otherwise unenforceable," that they "failed to timely refinance Farmers' maturing debt, thereby prompting a distressed sale of substantially all of Farmers' assets," and that they

failed to distribute dividends to Hamilton from the sale.

Breach of fiduciary duty is a tort claim for injury to personal property, and "[a]n action for … injury to personal property … must be commenced within two (2) years after the cause of action accrues." Ind.Code § 34–11–2–4; *City of East Chicago v. E. Chi. Second Century, Inc.*, 908 N.E.2d 611, 618 (Ind.2009).

█ In this case, the events relevant to Hamilton's breach of fiduciary duty claim all occurred on or before January 31, 2004, which is the date FECO finally sold the cooperative. Hamilton did not file his complaint until May 22, 2006. Accordingly, Hamilton filed his complaint outside the two-year limitations period.

█ Hamilton maintains that the statute of limitations was tolled by FECO's fraudulent concealment. Indiana Code section 34–11–5–1 provides that "[i]f a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at any time within the period of limitation after the discovery of the cause of action." The fraudulent concealment statute operates to delay accrual of an action and the commencement of the limitations period when the defendant has concealed the existence of the cause of action from the plaintiff. *Malachowski v. Bank One*, 590 N.E.2d 559, 563 (Ind.1992). Usually, to invoke the protection provided by this statute, the wrongdoer must have actively concealed the cause of action and the plaintiff is charged with the responsibility of exercising due diligence to discover the claims. *Id.* (citing *Hinds v. McNair*, 235 Ind. 34, 45, 129 N.E.2d 553, 560 (1955)). However, where the parties stand in a fiduciary relationship, the concealment of the claim need not be active. *Id.* A mere failure to disclose, when there is a duty to

disclose, may be sufficient to toll the statute. *Id.* (citing *Guy v. Schuldt,* 236 Ind. 101, 109, 138 N.E.2d 891, 895 (1956)).

■ " 'Acts of concealment coming after the statute has run do not remove the bar.' " *Olcott Int'l & Co. v. Micro Data Base Sys., Inc.,* 793 N.E.2d 1063, 1075 (Ind.Ct.App.2003) (quoting 54 C.J.S. *Limitations of Actions* § 90 (1987)). " 'The conduct or misrepresentation upon which a plaintiff's claim of estoppel to assert the statute of limitations is based must occur prior to the expiration of the limitation period, not after the right of action has been barred by the running of the statute.' " *Id.* (quoting 51 Am.Jur.2d *Limitation of Actions* § 382 (2000)).

■ Here Hamilton cites no evidence that FECO withheld information from him so as to toll the limitations period for his breach of fiduciary duty claim. The facts suggest the contrary. FECO's board of directors sent notice to all members that they were proposing sale of the cooperative, and Hamilton received notice and voted on the sale. Hamilton attempts to use the pretrial discovery dispute to bolster his allegations. He suggests that FECO's failure to disclose the asset purchase agreement, and the trial court's repeated orders to produce the sale records, justify a tolling of the statute of limitations. But even if FECO concealed the asset purchase agreement during discovery, that nondisclosure occurred well beyond the expiration of the limitations period and is thus irrelevant.

We conclude that the trial court erred by denying FECO's motion for judgment on the evidence with respect to Hamilton's claim for breach of fiduciary duty and by submitting the statute of limitations and "fraudulent concealment" issues to the jury.

### III. Interpretation, Validity, and Effect of the HTA Contracts

FECO finally contends that the trial court erred by asking the jury to determine the validity and effect of Hamilton's HTA contracts. FECO argues that these were questions of law reserved for the trial court, and that the court should have found as a matter of law that the agreements were legal and binding forward contracts which furnished valid consideration for Hamilton's promissory notes. According to Hamilton, the HTA contracts contained at least one ambiguity which required consideration of extrinsic evidence and resolution by a jury.

#### A. Standard of Review

■ The construction of a written contract is generally a question of law. *Kordick v. Merchants Nat'l Bank & Trust Co. of Indianapolis,* 496 N.E.2d 119, 125 (Ind.Ct.App.1986). Nevertheless, if reasonable people would find the contract susceptible to more than one construction, ambiguity exists placing the responsibility on the trier of fact to ascertain the extrinsic facts necessary to interpret the contract. *Id.* On the other hand, if the ambiguity arises not because of extrinsic facts, but by reason of the language used, construction of the ambiguous contract is a question of law for the trial court. *Id.*

#### B. Hedge–to–Arrive Contracts

■ Hamilton and FECO's purchase agreements are known commonly as HTAs. We begin by clarifying what an HTA is:

A hedge-to-arrive contract ("HTA") is an agreement between a farmer and a grain elevator for the sale of a fixed quantity of grain for delivery at a specific time in the future. The parties agree to a price per bushel set by reference to the Chicago Board of Trade ("CBOT") futures price for a particular month . . . .

The futures reference price is fixed at the time of contracting. . . .

HTA contracts benefit farmers by permitting them to lock in a particular price and to guarantee themselves a buyer for their grain prior to delivery. They face a risk, however, that grain prices will rise and that they will be committed to selling their grain at an agreed price below the current market value. By the same token, the elevator faces a risk that the futures reference price will fall, leaving the elevator locked into a price above the current market price. Each party can hedge against these risks by establishing a position in the futures market that is opposite to its contract position. For example, the elevator would hedge its risk when it contracts with a farmer by simultaneously establishing a "short" position (an obligation to sell) in the futures market for the month of delivery to offset its obligation to buy from the farmer.

Some HTA contracts (or the parties' practice under such contracts) allow the farmer to "roll" the delivery obligation to some future date, either to accommodate shortfalls in the crop yield or to allow the farmer to sell the grain on the "spot" (cash) market for a better price. . . .

*Lachmund v. ADM Investor Servs., Inc.,* 191 F.3d 777, 779–80 (7th Cir.1999) (citations omitted).

### C. Futures vs. Forward Contracts

▬▬ HTAs can in turn be characterized as either "futures" or "forward" contracts. The difference is as follows:

[A futures contract] is generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed.

To facilitate the development of a liquid market in these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss. The main purpose realized by entering into futures transactions is to transfer price risks from suppliers, processors and distributors (hedgers) to those more willing to take the risk (speculators). Since the prices of futures are contingent on the vagaries of both the production of the commodity and the economics of the marketplace, they are particularly susceptible to manipulation and excessive speculation.

In contrast to the fungible quality of futures, cash forwards are generally individually negotiated sales of commodities between principals in which actual delivery of the commodity is anticipated, but is deferred for reasons of commercial convenience or necessity. These contracts are not readily transferable and therefore are usually entered into between parties able to make and receive physical delivery of the subject goods.

*Salomon Forex, Inc. v. Tauber,* 8 F.3d 966, 971 (4th Cir.1993) (footnote omitted). In other words, futures contracts "are really a type of security, like common stock, rather than a means of fixing the terms by which farmers ship their output to grain elevators and other agricultural middlemen." *Nagel v. ADM Investor Servs., Inc.,* 217 F.3d 436, 440 (7th Cir.2000). "Forward contracts, by contrast, contemplate the 'actual, though deferred, delivery' of a commodity, and they 'entail . . . the generally fulfilled expectation that the contract will lead to the exchange of commodities for money.'" *Commodity Futures*

*Trading Comm'n v. Int'l Fin. Servs., (New York), Inc.,* 323 F.Supp.2d 482, 495 (S.D.N.Y.2004) (quoting William L. Stein, *The Exchange–Trading Requirement of the Commodity Exchange Act,* 41 Vand. L. Rev. 473, 491 (1988)).

The reason the futures/forward distinction is of consequence is that futures contracts are governed and regulated by federal law, but forward contracts are not. The Commodity Exchange Act, 7 U.S.C. §§ 1–25 (2006), requires that all futures contracts be traded on an exchange designated or registered by the Commodity Futures Trading Commission (CFTC). 7 U.S.C. § 6(a). Otherwise the contracts are unlawful. *Id.* "It is because commodity-futures contracts are a type of security that Congress has seen fit to subject them to a regulatory scheme ... which parallels that administered by the SEC for trading in corporate stock." *Nagel,* 217 F.3d at 440. Meanwhile the CEA does not regulate agreements for "any sale of any cash commodity for deferred shipment or delivery," *id.* § 1a(19), which are otherwise known as forward contracts. "These contracts are not subject to the CFTC regulations because those regulations are intended to govern only speculative markets...." *Andersons, Inc. v. Horton Farms, Inc.,* 166 F.3d 308, 318(6th Cir.1998).

The CEA does not provide explicit guidance on how to differentiate a futures from a forward contract. Instead, courts have distilled their own rules and factors to determine the character of the agreement. The refined, prevailing test classifies agreements as forward contracts when the following circumstances are present:

(1) The contract specifies idiosyncratic terms regarding place of delivery, quantity, or other terms, and so is not fungible with other contracts for the sale of the commodity, as securities are fungible....

(2) The contract is between industry participants, such as farmers and grain merchants, rather than arbitrageurs and other speculators who are interested in transacting in contracts rather than in the actual commodities.

(3) Delivery cannot be deferred forever, because the contract requires the farmer to pay an additional charge every time he rolls the hedge.

*Nagel,* 217 F.3d at 441 (citing *Lachmund,* 191 F.3d at 788–90; *Grain Land Coop v. Kar Kim Farms, Inc.,* 199 F.3d 983, 990–92 (8th Cir.1999); *Andersons, Inc.,* 166 F.3d at 317–22; *Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.,* 67 F.3d 766, 772–73 (9th Cir.1995); *Commodity Futures Trading Comm'n v. Co Petro Marketing Group, Inc.,* 680 F.2d 573, 579–81 (9th Cir.1982); *Top of Iowa Coop. v. Sime Farms, Inc.,* 608 N.W.2d 454, 465 (Iowa 2000)). If one or more of these features is absent, the agreement may or may not be a futures contract. *Id.*

Under any approach or formulation, the touchstone of the future/forward determination is whether the contract contemplates actual, physical delivery of the subject commodity. *See* 7 Richard A. Lord, *Williston on Contracts* §§ 17:10, 17:11 (4th ed. 1997).

### D. Resolution of this Case

 Hamilton's HTA contracts were not handled through a CFTC commodities exchange. Accordingly, if Hamilton's HTAs are properly construed as futures contracts, then they were invalid and unlawful, and they could not serve as consideration for the promissory notes that the parties executed thereafter. If on the other hand Hamilton's HTAs were in fact forward contracts, then they fall outside the purview of the CEA, they were lawful

and valid, and they furnished consideration for the promissory notes.

In light of the foregoing *Nagel* factors, we find as a matter of law that Hamilton and FECO created four valid and enforceable forward contracts. The contracts provided specific terms for delivery and were not simply fungible securities. The contracts were between industry participants—a farmer and a grain elevator—rather than arbitrageurs. Furthermore, delivery could not be deferred indefinitely, as there was no clause in the contracts which so provided, and Hamilton was charged a rolling fee for each extension of time that he sought. We conclude that the agreements, when viewed as a whole, contemplated actual, physical delivery of grain and were not just a means of speculation.

Hamilton maintains that "a factual dispute existed regarding whether the HTA Contracts had a delivery date and rolling charge.... Because the HTA Contracts were uncertain or ambiguous about delivery, the jury, as the fact finder, was allowed to resort to extraneous facts to arrive at the true meaning of the contracts, and the contracts' construction became a mixed question of law and fact...." Appellee's Br. p. 39. We acknowledge that Hamilton's contracts did not specify delivery dates or rolling charges. But omission of a delivery date does not preclude a finding, as a matter of law, that an agreement is a forward contract. *See, e.g., Grain Land Coop,* 199 F.3d at 991; *Sack Bros. v. Great Plains Coop., Inc.,* 260 Neb. 292, 616 N.W.2d 796, 808 (2000). And even in the absence of an explicit contractual provision, it is undisputed that Hamilton was charged a rolling fee for every delivery extension, thus precluding indefinite deferral.

We hold that Hamilton and FECO's HTAs were legitimate forward contracts, and Hamilton's promissory notes were thus supported by valid consideration. Accordingly, the trial court erred by submitting the issue of the enforceability of these contracts to the jury. We have further held that many of Hamilton's claims were barred by the applicable statutes of limitations. Since the jury found for Hamilton and compensated him on his claims against FECO, we reverse and remand.

Reversed and remanded.

RILEY, J., and CRONE, J., concur.