

FILED

Dec 29 2017, 11:32 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

C. Dennis Wegner
C. Dennis Wegner & Associates, Pro.
Corp.
Indianapolis, Indiana

ATTORNEY FOR APPELLEES

David Becsey
Zeigler, Cohen & Koch
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Nancy McDaniel, as Personal
Representative of the Estate of
Fred C. McDaniel, III, deceased,

*Appellant-Plaintiff,*

v.

William C. Erdel, M.D., and
Indiana Gastroenterology, Inc.,

*Appellees-Defendants.*

December 29, 2017

Court of Appeals Case No.
49A05-1612-CT-2759

Appeal from the Marion Superior
Court

The Honorable James A. Joven,
Judge

Trial Court Cause No.
49D13-1605-CT-15333

**Brown, Judge.**

[1] Nancy McDaniel, as personal representative of the estate of her husband, Fred C. McDaniel, III (the "Estate"), appeals the trial court's entry of summary judgment in a medical malpractice action in favor of Dr. William C. Erdel and Indiana Gastroenterology, Inc. ("Indiana Gastroenterology"). The Estate raises one issue which we restate as whether the court erred in entering summary judgment in favor of Dr. Erdel and Indiana Gastroenterology. We affirm.

## Facts and Procedural History

[2] On February 6, 2002, Mr. and Mrs. McDaniel saw Dr. Azade Yedidag in the Liver Pre-Transplant Clinic of the merged IU/Methodist Liver Transplant Program in consultation for a possible liver transplant evaluation for Mr. McDaniel's end-stage liver disease secondary to alcohol. Dr. Yedidag told Mrs. McDaniel on April 17, 2002, that for Mr. McDaniel to be on the transplant list, he needed to complete a rehabilitation and attend AA. Mr. McDaniels did not return to see Dr. Yedidag, and he was not placed on the transplant list.

[3] Dr. Erdel, a gastroenterologist, began seeing Mr. McDaniel for liver cirrhosis and related complications in December 2002.[1] In August 2006, Mr. McDaniel's primary care provider, Dr. George DeSilvester, ordered an ultrasound to follow-up on his cirrhosis and it showed a problem, potentially cancer, with Mr. McDaniel's liver. Mrs. McDaniel sent the report to Dr. Erdel,

---

[1] Mrs. McDaniel, the medical assistant of Dr. George DeSilvester, attended every office visit her husband had with Dr. Erdel in the room alongside him.

called his office on August 18, 2006, and he told her that the ultrasound was abnormal and asked that Mr. McDaniel have an MRI of the liver and a serum alpha-fetoprotein level drawn, or a blood test that can show a tumor marker or activity of a tumor in the liver. Mrs. McDaniel discussed with Mr. McDaniel the need for the tests, but he did not want to do anything or know at that time if there were problems or not. On August 21, 2006, Mrs. McDaniel called Dr. Erdel, was upset, and reported that her husband was being stubborn, would not have an MRI, and that she knew there was nothing she could do. She also reported that Mr. McDaniel said "he didn't want to know at that time. He would just die anyway, and he didn't really want to know if it was or wasn't." Appellee's Appendix Volume 2 at 45. She called back the same day to ask if the nodule on the liver was a tumor and if it was cancer, would it be operable. On August 23, 2006, Dr. Erdel spoke by telephone with Mrs. McDaniel, who told him that Mr. McDaniel still refused an MRI and that he was still drinking a few beers. In December 2006, Dr. DeSilvester ordered a follow-up ultrasound that showed that the tumor was growing, and Mr. McDaniel went to see Dr. Erdel on December 13, 2006.

[4] In the spring of 2007, Dr. Erdel had a conversation with Mr. McDaniel about the risks and benefits of a percutaneous liver biopsy, and Mr. McDaniel decided not to undergo the treatment or procedure. Dr. DeSilvester ordered another ultrasound on April 19, 2007, and Mr. McDaniel returned to see Dr. Erdel on April 23, 2007. The ultrasound report showed an enlarging lesion that was probably hepatocellular carcinoma and would continue to grow. Dr. Erdel

discussed with Mr. and Mrs. McDaniel treatment options of a cancer diagnosis, told Mr. McDaniel that he was not a transplant candidate, but he might possibly be a hepatectomy candidate or a candidate for local ablation, and Mr. McDaniel told Dr. Erdel that he did not want a liver biopsy and he also refused an MRI or further testing.

On October 22, 2007, Mr. McDaniel reported to Dr. Erdel "ascites and pain" and that he was still drinking alcohol, an ultrasound was scheduled for that week, and Dr. Erdel asked him to return after the ultrasound. Appellant's Appendix Volume 2 at 49. Mr. McDaniel did not return at that time. On November 2, 2007, Mrs. McDaniel called and told Dr. Erdel that Dr. DeSilvester was sending records to Dr. Maurice Arregui to consider ablation therapy. Dr. Erdel told Mrs. McDaniel that they would wait and see what Dr. Arregui said, but that Mr. McDaniel may have waited too long to seek treatment. Dr. Arregui first evaluated Mr. McDaniel in November 2007 and, thereafter, he and his team of surgical oncologists treated Mr. McDaniel's presumed liver cancer with radiofrequency ablation treatments, with the first treatment occurring on December 18, 2007, and then treatments occurring on May 7, 2009, in late summer 2010, and in summer 2011. After Dr. Arregui assumed the surgical oncology treatment of Mr. McDaniel's presumed liver cancer, Dr. Erdel was not consulted or involved in the medical decisions related to the treatment of Mr. McDaniel's liver cancer. On November 17, 2008, Dr. Erdel saw Mr. McDaniel, and the last time he saw or spoke with Mr. McDaniel was on December 8, 2010, for a follow-up on his cirrhosis. After December 8,

2010, Mrs. McDaniel had some telephone contact with Dr. Erdel, including on December 19, 2011.

[6] On February 24, 2012, Mr. McDaniel saw a Dr. Sorg at the Community Spine Center, and Mrs. McDaniel told him that her husband had cancer of the liver. In July 2012, Dr. Arregui could not complete any more radio frequency ablations because the lesions had returned and arranged for Mr. McDaniel to see Dr. Brandon Martinez for the radiation based treatment Y-90, where pellets of radiation are inserted through the femoral groin area up into the liver to destroy new tumors that had grown on the liver at that point.

[7] On August 22, 2012, Mrs. McDaniel called Dr. Erdel, who called her back, and told him that Mr. McDaniel was declining and was developing confusion, and Dr. Erdel recommended he take Kristalose until the confusion either cleared up or diarrhea developed. At midnight on August 22, 2012, Mrs. McDaniel brought her husband into the emergency room at Community Hospital North, where he later died on September 1, 2012.

[8] On February 22, 2013, the Estate filed a proposed complaint before the Indiana Department of Insurance, naming Dr. Arregui as the sole defendant, and alleging in part that the "treatment rendered by Dr. Arregui to [Mr. McDaniel] was inappropriate in that it was only palliative and not curative," and that "Dr. Arregui failed to assist [Mr. McDaniel] in obtaining a liver transplant which would have cured his end stage liver disease." *Id.* at 34. On March 7, 2014, Mrs. McDaniel filed an amended proposed complaint and added Dr. Arregui's

medical group as a named defendant. On August 4, 2014, Mrs. McDaniel filed a second amended proposed complaint, added Dr. DeSilvester and his group, Dr. Erdel, and Indiana Gastroenterology as named defendants, and alleged in part that "[o]n and after August 16, 2006, Dr. DeSilvester failed to offer [Mr. McDaniel] a referral for evaluation of a liver transplant which would have cured his end stage liver disease," that "Dr. Arregui failed to offer [Mr. McDaniel] a referral for evaluation of a liver transplant which would have cured his end stage liver disease," and that "Dr. Erdel failed to refer [Mr. McDaniel] to be evaluated for a liver transplant which would have cured his end stage liver disease." *Id.* at 41-42. On January 28, 2015, the Estate filed a voluntary dismissal with prejudice as to Dr. Arregui, Dr. DeSilvester, and their respective medical groups.

[9] On April 27, 2016, Dr. Erdel and Indiana Gastroenterology filed a motion for preliminary determination of law and for summary judgment. In support of the motion, they designated as evidence the deposition of Mrs. McDaniel, all three of the Estate's complaints and January 28, 2015 voluntary dismissal, and an affidavit of Dr. Erdel. On August 1, 2017, the Estate filed a memorandum of law in opposition to summary judgment and designated selections of the certified records of Indiana Gastroenterology and IU Health, the depositions of Dr. Erdel, Dr. DeSilvester, and Dr. Arregui, three Northwest Radiology reports, Dr. Arregui's certified records, and the affidavits of Mrs. McDaniels and Drs. E. Allen Griggs and Walid Ayoub.

[10]     In her deposition, Mrs. McDaniel answered affirmatively when asked if part of the allegation was that Dr. Erdel should have done something more for Mr. McDaniel to have a liver transplant, and answered the question as to what more Dr. Erdel should have done by stating, "I think he should have said, [Mr. McDaniel], if you stop drinking forever and you go back to the AA and to the rehab and go back to the IU and get back on the transplant list, you might have a chance to live." Appellee's Appendix Volume 2 at 84. When asked when she thought that should have been done, she answered "April 23rd," and when asked of what year, she answered "2007, on that visit. It's when my husband lost hope and lost all sense of everything at that point." *Id.* She answered affirmatively when asked if she thought, had Dr. Erdel told Mr. McDaniel that he might qualify for a liver transplant if he were to stop drinking, and added Mr. McDaniel "would have complied to that"; answered negatively when asked if Mr. McDaniel had ever told her that he wished for Dr. Erdel to have approached him to tell him that; and testified that no "health care professional expert" expressed to her "the opinion that if [Mr. McDaniel] would have stopped drinking and he might qualify for a liver that he would get a transplant." *Id.* at 109-110. She agreed that she never discussed an oncology referral with Dr. Erdel, and stated she could not recall if she ever asked for one. In response to a question about the conversations Mr. McDaniel had about stopping his drinking with family members after seeing Dr. Erdel and after they knew that he had a potential tumor in his liver, she stated, "[o]h, after that, I really don't think he really cared about it. I think he was going to drink no

matter what because he thought he was going to die at that point. And before that, he did try." *Id.* at 111-112.

[11] In his deposition, Dr. Erdel answered negatively when asked if "[i]n 2002 when you were seeing [Mr. McDaniel], if you – since Dr. Upchurch had recommended him for consideration as a candidate for liver transplant, obviously Mr. McDaniel didn't go through with that. Do you know why as you sit here today," and he answered affirmatively when asked if there was "any reason why [Mr. McDaniel] did not qualify for a liver transplant in 2006 or 2007." Appellant's Appendix Volume 3 at 6. Dr. Erdel testified that the reason why Mr. McDaniel did not qualify in 2006 or 2007 was because "[h]e had started drinking. Well, he was drinking." *Id.* He answered, "I have no documentation" when asked if he had documented "in 2006, 2007 that you told [Mr. McDaniel] that if he did not – if he would quit drinking and could be abstinent, that he might otherwise qualify as a candidate for a liver transplant." *Id.* When questioned if there was "generally any reason why when you first suspected that [Mr. McDaniel] had hepatocellular carcinoma you didn't immediately refer him . . . to an oncologist, a liver transplant surgeon, or a surgical oncologist," Dr. Erdel answered, "[h]e refused." *Id.* When asked if during his "care and treatment of [Mr. McDaniel], there was a period of time when he went four years abstaining from alcohol, is that not true, if your records show that," Dr. Erdel stated "I'm not sure they do" and, after being asked "[w]hy is that," followed up with "I'm trying to think of the exact time. It was probably at least three years." *Id.* at 7.

[12] Dr. Erdel testified that he was familiar with the Milan criteria[2] and that it was "possible" that a patient who might have a tumor that is considered too large to qualify for a liver transplant may have radiofrequency ablation in which the tumor is shrunk and then may qualify for a liver transplant. *Id.* at 8. He testified that on July 25, 2005, Mrs. McDaniel called and said "she was concerned about his increasing alcohol intake" and he called Mr. McDaniel and "confronted him about the drinking"; that at the next meeting on August 18, 2005, Mr. McDaniel had indicated that he had stopped drinking and Dr. Erdel had noted that "he had went four years but seemed to be really craving more alcohol lately"; that there was a notation in the medical records for the January 16, 2006 meeting that [Mr. McDaniel] had continued to drink and had four beers in January of 2006; and that a November 17, 2008 entry noted Mr. McDaniel's statement that he had not had alcohol since November of 2007. *Id.* at 10, 12.

[13] During the deposition, the following exchange occurred:

> [Counsel]: What did he say?
>
> [Dr. Erdel]: He said he had not had alcohol since November of '07.
>
> * * * * *
>
> [Counsel]: Did you believe him?

---

[2] The Milan criteria "defines the size and the number and location of [the] tumor" and lays out the requirements for qualification for liver transplantation for hepatocellular carcinoma. Appellant's Appendix Volume 3 at 8. **)**

[Dr. Erdel]: I had no choice.

[Counsel]: Well, according to you, would that not have qualified him to be a potential candidate for a liver transplant?

[Dr. Erdel]: Not necessarily.

[Counsel]: If he could meet the Milan criteria?

[Dr. Erdel]: At that point I didn't know what was going on.

*Id.* at 12. Dr. Erdel stated that he requested Mr. McDaniel to come back and see him when counsel later asked,

[a]t that time when you found out he hadn't been drinking for a year. And according to you, if he'd stopped drinking, he may have met the Milan criteria to have a liver transplant. And if that was true, would you have not wanted to see him to see if he emotionally had a change of heart?

*Id.* When directed to a note of December 8, 2010, and asked by counsel if there was "any reason why you could not have suggested to him, . . . you're doing so well, why don't you go . . . check out the IU liver transplant program," Dr. Erdel responded that "[a]t that point he was, I felt, under the care of Dr. Arregui for the primary cancer, and I was not basically making any recommendations on treatment at that point," and when asked "what would have been wrong with offering [Mr. McDaniel] the opportunity to be a candidate for a liver transplant," he stated, "at that point in time, I did not have complete records on what all he was having done and the status of his ablation or anything else." *Id.* at 13-14. Dr. Erdel answered affirmatively when asked whether "there also has to be a sustained and permanent establishment of

abstinence from alcohol for him to qualify under the Milan criteria," whether "a sustained and permanent abstinence from alcohol for a transplant candidacy" needs "more than just a verbal report from the patient that he's not drinking," and, whether "for instance of an outpatient rehabilitation program typically" there needs to be "proven documentation of attendance at AA." *Id.* at 15.

[14]  In his deposition, Dr. Arregui testified that it would not be a fair statement to say that on May 16, 2008 that Mr. McDaniel met the Milan criteria, because "this does not preclude the fact that he had a lesion that 6.9. It just meant that I successfully treated that lesion and that, because I had ablated that lesion. Now he has several other areas that are, that are enhancing." *Id.* at 70. In response to being asked why he did not contact Dr. Erdel and inquire into the basis for the note saying that Mr. McDaniel was not a transplant candidate, Dr. Arregui testified that he "felt that [Mr. McDaniel] fulfilled the criteria for not being a transplant candidate. His lesion was big. And at the time of the surgery it was 6.9 centimeters. He was actively drinking, which is probably why, one of the reasons he was turned down." *Id.* at 68. In response to the question that on November 14, 2007, Mr. McDaniel "did not qualify for a liver transplant because his, the mass in his liver, likely hepatocellular carcinoma, was too big," Dr. Arregui stated that "[b]y that criteria it was too big," and when asked if he agreed that "the liver transplantation for hepatocellular carcinoma has a long-term result suggesting excellent outcomes, especially when the subject qualified through the Milan criteria," he stated, "I believe that [Mr. McDaniel] was

evaluated by a well-known center and by report he was refused and he did not meet the standard criteria used commonly in the United States." *Id.* at 69.

[15] After hearing argument on the motion, the trial court granted summary judgment in favor of Dr. Erdel and Indiana Gastroenterology on November 18, 2016.

## *Discussion*

[16] The issue is whether the trial court erred in entering summary judgment in favor of Dr. Erdel and Indiana Gastroenterology. We review an order for summary judgment de novo, applying the same standard as the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). Our review of a summary judgment motion is limited to those materials designated to the trial court. *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind. 2001). In reviewing a trial court's ruling on a motion for summary judgment, we may affirm on any grounds supported by the Indiana Trial Rule 56 materials. *Catt v. Bd. of Comm'rs of Knox Cnty.*, 779 N.E.2d 1, 3 (Ind. 2002). The moving party bears the initial burden of making a *prima facie* showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Manley v. Sherer*, 992 N.E.2d 670, 673 (Ind. 2013). Summary judgment is improper if the moving party fails to carry its burden, but if it succeeds, then the nonmoving party must come forward with evidence establishing the existence of a genuine issue of material fact. *Id.* We construe all factual inferences in favor of the nonmoving party and resolve all doubts as to the existence of a material issue against the moving party. *Id.*

[17] The Estate contends that it timely filed its second amended proposed complaint for medical malpractice. Specifically, it argues that Dr. Erdel owed a duty to inform Mr. McDaniels of material information relevant to his informed decision about treatment, and the statute of limitations was tolled when Dr. Erdel breached that duty by fraudulently concealing the material information, that the physician-patient relationship between Dr. Erdel and Mr. McDaniel did not terminate until August 22, 2012, and that the unexplained disappearance of a record of an office visit from Dr. Erdel's medical records impeded the bringing of litigation by delaying the discovery of the fraudulent concealment.

[18] Dr. Erdel and Indiana Gastroenterology contend that the claim is time barred because it was not filed within two years of the occurrence of the alleged malpractice, that by November 2007, the McDanielses possessed enough information that would have led a reasonably diligent person to make a discovery of the potential malpractice claim and waiting five and one-half years to sue was inexcusable, and that neither the continuing wrong doctrine nor fraudulent concealment save the claim. Specifically, they argue that Mrs. McDaniels knew her husband had terminal liver cancer by July 2012 which had first been identified on 2006-2007, that because the claim is based in a failure to do something, the omission began to run at the latest on December 8, 2010, when Dr. Erdel last rendered a diagnosis or last saw and spoke with him, and that Mrs. McDaniels had personal knowledge of the discussions documented in the supposedly missing and allegedly concealed office record.

[19]    Indiana's Medical Malpractice Statute of Limitations states:

> (b) A claim, whether in contract or tort, may not be brought against a healthcare provider based on professional services or health care that was provided or that should have been provided unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect . . . .

Ind. Code § 34-18-7-1. In determining whether a medical malpractice claim has been commenced within the medical malpractice statute of limitations, the discovery or trigger date is the point when a claimant either knows of the malpractice and resulting injury, or learns of facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury. *David v. Kleckner*, 9 N.E.3d 147, 152-153 (Ind. 2014). Depending on the individual circumstances of each case, a patient's learning of the resulting disease or the onset of resulting symptoms may or may not constitute the discovery or trigger date. *Id.* at 153. The point at which a particular claimant either knew of the malpractice and resulting injury, or learned of facts that would have led a person of reasonable diligence to have discovered the malpractice and resulting injury, must be determined. *Id.* When a medical malpractice defendant asserts the statute of limitations as an affirmative defense, that defendant "bears the burden of establishing that the action was commenced beyond that statutory period." *Id.* (quoting *Overton v. Grillo*, 896 N.E.2d 499, 502 (Ind. 2008)). If established, the burden shifts to the plaintiff to establish "an issue of fact material to a theory that avoids the

defense." *Id.* (quoting *Overton*, 896 N.E.2d at 502 (quoting *Boggs v. Tri-State Radiology, Inc.*, 730 N.E.2d 692, 695 (Ind. 2000))).

[20] The equitable doctrine of fraudulent concealment may operate to toll the statute of limitations in the medical malpractice context until the termination of the physician-patient relationship or until discovery of the alleged malpractice, whichever is earlier. *Boggs*, 730 N.E.2d at 698. When the doctrine is applicable, "the patient must bring his or her claim within a reasonable period of time after the statute of limitations begins to run." *Id.* To successfully invoke the doctrine of fraudulent concealment, a plaintiff must establish the concealment of material information somehow prevented her from inquiring into or investigating her condition, thus preventing her from discovering a potential cause of action. *Garneau v. Bush*, 838 N.E.2d 1134, 1142 (Ind. Ct. App. 2005), *trans. denied*.[3]

[21] The alleged malpractice of Dr. Erdel occurred at the April 23, 2007 office visit. The Estate filed its complaint against Dr. Erdel and Indiana Gastroenterology on August 4, 2014. Because the evidence shows that the action was commenced more than two years after the date of the alleged malpractice, the

---

[3] The Estate agrees with Dr. Erdel and Indiana Gastroenterology that the continuing wrong doctrine does not apply to this case and concedes that this case "does not involve . . . constructive or passive fraudulent concealment." Appellant's Reply Br. at 4. Thus, we do not address the continuing wrong or constructive concealment doctrines.

burden shifts to the Estate to establish an issue of fact material to a theory that avoids the defense.

[22] The Estate argues that Dr. Erdel committed malpractice because he failed to mention the Milan criteria when he told Mr. McDaniel on April 23, 2007, that he was not a transplant candidate. The record reveals that the option of a liver transplant was presented as early as 2002. Both Mr. and Mrs. McDaniel were aware that the use of alcohol was inconsistent with participation in the liver transplant program as early as the April 17 return visit of the same year, at which time Dr. Yedidag explained that two requirements needed to be completed before he could qualify for the transplant list, including completion of rehabilitation and AA attendance. Because Mr. McDaniel did not achieve the former, he was not placed on the liver transplant list as a transplant candidate. While the evidence demonstrates that Dr. Erdel was informed at some point that Mr. McDaniel had stopped drinking for a period of one year, it also establishes that Mr. McDaniel's alcohol usage persisted, with Mrs. McDaniel telling Dr. Erdel that he was still drinking on August 23, 2006, and Mr. McDaniel telling him similarly in October 2007, after the alleged malpractice on April 23, 2007.

[23] Furthermore, the evidence reveals that Mr. McDaniel refused certain testing and MRIs as requested by Dr. Erdel while under his care, that his office visits with Dr. Erdel ceased completely after December 8, 2010, and that Dr. Erdel was not involved in the medical decisions related to the treatment of Mr. McDaniel's liver cancer starting when Dr. Arregui and his team of surgical

oncologists assumed treating Mr. McDaniel's presumed liver cancer with at least four radiofrequency ablation treatments, occurring between December 2007 and the summer of 2011. Under these circumstances, we conclude that the Estate has not met its burden of establishing an issue of fact material to a theory that avoids the defense of the statute of limitations.

### *Conclusion*

[24] For the foregoing reasons, we affirm the entry of summary judgment in favor of Dr. Erdel and Indiana Gastroenterology and against the Estate.

[25] Affirmed.

May, J., and Pyle, J., concur.