FILED

Apr 28 2020, 8:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR
APPELLANT/CROSS-APPELLEE
CITY OF MARION

Philip A. Whistler
Derek R. Molter
Eric McKeown
Ice Miller LLP
Indianapolis, Indiana

Thomas R. Hunt
City of Marion
Marion, Indiana

ATTORNEYS FOR
APPELLEE/CROSS-APPELLANT
LONDON WITTE GROUP, LLC

Crystal G. Rowe
Kightlinger & Gray, LLP
New Albany, Indiana

Thomas F. Falkenberg
Falkenberg & Ives, LLP
Chicago, Illinois

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| City of Marion, <br><br> *Appellant-Plaintiff/Cross-Appellee,* <br><br> v. <br><br> London Witte Group, LLC, Chad Seybold, Estate of Michael Y. An, Global Investment Consulting, Inc., and World Enterprise Group, Inc., <br><br> *Appellees-Defendants/Cross-Appellants* | April 28, 2020 <br><br> Court of Appeals Case No. 19A-MI-1762 <br><br> Appeal from the Grant Superior Court <br><br> The Honorable Warren Haas, Judge <br><br> Trial Court Cause No. 27D03-1612-MI-168 |

**Baker, Judge.**

[1] In 2009, the City of Marion (the City) retained London Witte Group, LLC (LWG), to provide financial advice regarding the financing of a construction project. The project went unfinished for years. In 2017, the City filed a complaint against LWG for negligence, breach of fiduciary duty, and constructive fraud/unjust enrichment. LWG moved for summary judgment, and the trial court granted its motion with respect to the first two counts after finding those claims to be time-barred. The trial court denied the motion with respect to the third count, finding a longer statute of limitations period applied to that claim. We affirm the grant of summary judgment in LWG's favor on the first two counts and reverse the denial of the motion with respect to the third count.

# Facts

[2] A few years before 2008 or 2009, the YMCA in Marion moved into a new space, leaving the old YMCA building in downtown Marion vacant. In 2008 or 2009, the City began discussions with Michael An, a developer from California. An proposed a redevelopment of the old YMCA building into a combination of hotel, restaurant, retail, and commercial spaces. He estimated that the project would cost around $5.5 million. The City was willing to provide bond financing in the amount of $2.5 million, meaning that An had to come up with $3 million from other sources.

[3]     The core of the City's project team was Mayor Wayne Sebold, Director of Development Darren Reese, Bruce Donaldson of Barnes and Thornburg, and Bob Swintz of LWG. Reese was the point person on the project. Donaldson, who served as bond counsel, reported to Reese. Swintz served as financial advisor. The bonds would be funded from a tax-increment financing (TIF) district, with Swintz's role being to determine "how much room is in the TIF district to do this project." Appellant's App. Vol. II p. 197. Essentially, Swintz's primary job was to ensure that the City could pay back the bonds.

[4]     First Farmers Bank (the Bank) emerged as the prospective bond buyer. The Bank and the City each expected that An would provide proof that he had attained the additional $3 million in financing. In December 2009, shortly before the bond issue, Swintz told the Bank that he had spoken with Reese and Mayor Seybold and that the City had "the comfort they need[ed] for the YMCA project." Appellant's App. Vol. III p. 231. Reese and Donaldson were included on the email and Reese later said that he had no reason to dispute Swintz's statement. A few days later, the Bank again questioned whether An had the full funding in hand in correspondence to Reese and Donaldson, reminding them that the Bank "need[ed] to insure that there [were] sufficient funds to complete the project at all times." *Id.* at 234. Swintz responded to the Bank, explaining that "[a]s far as the City is concerned the developer had provided written documentation about the funding to complete the project." *Id.* at 237. Swintz later testified that he "would not have come up with [his

response] without talking to" Reese, Mayor Seybold, or Donaldson. Appellant's App. Vol II. p. 239-40.

[5] Meanwhile, on December 4, 2009, An, through Chad Seybold,[1] provided a memorandum of understanding (the Memo) to Swintz. The Memo was non-binding and signed by Se Kwon Cho; it stated that Cho would make $3 million available to An to complete the project. The Memo also indicated that it was not a final, legally binding agreement, though both An and Cho signed it. Chad indicated to Swintz that the Memo was the proof requested by the City and the Bank that An had the $3 million in financing on hand. Years later, at the time of the litigation at issue herein, neither Mayor Seybold nor Reese recalled knowing about the Memo. The City claims that Swintz intentionally withheld the Memo from the Bank and the City.

[6] Evidently, Swintz's assurances satisfied the Bank, because the bonds were issued on December 16, 2009. At some point, construction began, but it was never completed. The City refinanced the bonds in 2011, after which An continued to work on the project and to look for investors.

[7] In December 2013, four years after the bond issue, the *Marion Chronicle-Tribune* published several critical articles about the project and submitted several information requests. In response, the City hired KPMG to perform a forensic audit of the project; KMPG found no improprieties, though Chad failed to

---

[1] Chad is Mayor Seybold's brother.

comply with KPMG's document requests. The State Board of Accounts (SBOA) also reviewed the project and found, in the spring of 2014, that it was nearly completed.

[8] In December 2015, An died. The project remained unfinished. The City filed a complaint against An's estate on December 8, 2016. The City entered into a tolling agreement with LWG on February 13, 2017, which tolled the statute of limitations through September 30, 2017. On September 29, 2017, the City filed an amended complaint, adding Chad and LWG as defendants. The primary allegation from which the City's claims against LWG stems is that LWG "not only failed to tell the City that An lacked the money to complete the project, it prevented the Bank from learning it—a fact which would have stopped, or at least substantially changed, the bond issue." Appellant's Br. p. 8. The specific claims remaining against LWG are for negligence, breach of fiduciary duty, and constructive fraud/unjust enrichment.

[9] During the discovery process, the City allegedly first became aware of the Memo. Additionally, discovery has revealed that bond proceeds were used to provide personal benefits to Mayor Seybold, including payment of the premium on a life insurance policy, cash payments to Mayor Seybold's wife, and contributions to Mayor Seybold's political campaigns. Moreover, An was allegedly told that the City would invest in his project only if he hired the Mayor's brother, Chad.

[10] On May 17, 2019, LWG filed a motion for summary judgment on each of the three claims against it. LWG's motion focused on the statute of limitations for each claim, arguing that the complaint was filed outside the limitations period. During the oral argument on the summary judgment motion, counsel for the City conceded that "in [the spring of] 2014, the City . . . certainly had some concerns about the misapplication of bond proceeds." Tr. Vol. II p. 36.

[11] On July 8, 2019, the trial court entered an order granting LWG's motion with respect to the claims for negligence and breach of fiduciary duty and denying it with respect to the claim for constructive fraud/unjust enrichment. In pertinent part, the trial court found as follows:

> [The negligence and breach of fiduciary duty] Counts are based on the two-year statute of limitations contained in Ind. Code § 34-11-2-4(a). The two-year period had expired long before February 16, 2017 when [LWG] signed a tolling agreement with the City.
>
> [LWG's] work for the City as it relates to this case was divided into two parts:
>
> - The December 1, 2009 Series 2009 Bonds for a principal amount of $2,500,000; and
> - The February 15, 2011 Refinancing of the 2009 Bonds and consolidation of obligations from other City projects.
>
> [LWG's] work on the 2009 Bonds and its work on the 2011 Refinancing are intertwined. At the latest the City became aware that bond funds may have been misappropriated in the Spring of 2014. As a result the City's Corporate Counsel employed a forensic accounting firm to investigate and the City requested an

investigation by the State Board of Accounts. The Court determines that at the latest the statute of limitations . . . began to run as of the Spring of 2014.

***

The Court finds that the City may not rely upon the continuous representation nor the adverse domination nor fraudulent concealment . . . to extend the begin date for the two-year statute of limitations . . . .

***

The Court denies the relief requested in the SJ Motion as to [the constructive fraud/unjust enrichment claim. That claim] is based on the six-year statute of limitations contained in I.C. § 34-11-2-7(4) and did not begin to run until [LWG's] work on the 2011 Refinancing was completed.

Appealed Order p. 1-2. The trial court deemed the grant of summary judgment on the first two counts to be a final and appealable judgment; it later certified the denial of summary judgment on the third count for interlocutory appeal. The City now appeals and LWG cross-appeals.

# Discussion and Decision

[12] The City argues that the trial court erred in granting summary judgment in LWG's favor on the negligence and breach of fiduciary duty claims. LWG cross-appeals, arguing that the trial court erred in denying summary judgment on the claim for constructive fraud/unjust enrichment.

[13] Our standard of review on summary judgment is well established:

We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).

[14] All the arguments on appeal and cross-appeal turn on statutes of limitations. Statutes of limitations are "practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost." *V. Ganz Builders & Dev. Co. v. Pioneer Lumber, Inc.*, 59 N.E.3d 1025, 1032 (Ind. Ct. App. 2016) (internal quotation omitted). A statute of limitations defense is particularly well suited for determination by summary judgment. *Id.*

# I. Appeal

[15] It is undisputed that a two-year statute of limitations governs the City's claims against LWG for negligence and breach of fiduciary duty. Ind. Code § 34-11-2-4. Because the City entered into a Tolling Agreement with LWG on February 13, 2017, and filed its complaint against LWG within the tolling period, LWG is required to show that the statute of limitations for these claims began to run

before February 13, 2015, to be entitled to summary judgment. In other words, as the movant, LWG had the burden of establishing as a matter of law that (1) before February 13, 2015, (2) the City knew or should have known that it had been damaged (3) as a result of misconduct.

[16] The City argues that there are four reasons that the claims did not begin to run before February 13, 2015: the discovery rule does not apply; the continuous representation doctrine tolled the limitations period; LWG's fraudulent concealment should prevent the limitations period from barring the claims; and the adverse domination doctrine prevented the limitations period from accruing.

## A. Discovery Rule

[17] Under the discovery rule, the statute of limitations does not begin to run until the plaintiff actually knows, or in the exercise of ordinary diligence could have discovered, that it has sustained an injury from tortious conduct. *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind. 1992). The discovery rule "does not mandate that plaintiffs know with precision the legal injury that has been suffered, but merely anticipates that a plaintiff be possessed of sufficient information to cause him to inquire further in order to determine whether a legal wrong has occurred." *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 689 (Ind. Ct. App. 2006).

[18] Here, the City's claims focus on An's lack of financing at the time the bonds were issued. Because the bonds would not cover the full cost of the project, the

City and the Bank required that An would have sufficient financing on hand to cover the rest. According to the City, LWG "not only failed to tell the City that An lacked the money to complete the project, it prevented the Bank from learning it[.]" Appellant's Br. p. 8. In other words, the actual injury occurred (if at all) at the time of the bond issue—in December 2009.[2]

[19] By pointing to the date of the alleged wrongdoing, LWG met its prima facie burden as movant to show that the lawsuit was filed outside the two-year statute of limitations. The burden then shifted to the City. *See McDaniel v. Erdel*, 91 N.E.3d 617, 624 (Ind. Ct. App. 2017) ("Because the evidence shows that the action was commenced more than two years after the date of the alleged [wrongdoing], the burden shifts to the [non-movant] to establish an issue of fact material to a theory that avoids the defense."), *trans. denied*. But here, the City submitted *no* evidence—not even a self-serving affidavit—to show when or how the City was possessed of sufficient information to cause it to inquire further. The City claimed that it had "designated evidence supporting an inference that its claims did not accrue until sometime after December 31, 2015," but we are unable to discern what that evidence might be. Appellant's App. Vol. VII p. 59.

[20] The trial court zeroed in on the lack of evidence supporting the City's position regarding when it discovered the wrongdoing. At the summary judgment

___

[2] Although the City originally alleged additional injuries stemming from the 2011 refinancing, it has since abandoned that position.

argument, the trial court pushed the City to answer when it had "discovered" the claims against LWG. Tr. Vol. II p. 36. Counsel responded that "in 2014, the City . . . certainly had some concerns about the misapplication of bond proceeds." *Id.*

[21] Generally, we prefer not to rely solely on a concession made by an attorney during oral argument. And here, while we take that into consideration, it need not be the sole focus of our analysis. We find five key undisputed facts to be dispositive. *See Perryman*, 846 N.E.2d at 689 (holding that the law "does not require a smoking gun in order for the statute of limitations to commence").

[22] First, the YMCA project remained unfinished more than four years after the 2009 bond issue. By 2013, the local newspaper began printing a series of articles criticizing the project and questioning its status. The fact that the project was still unfinished years later and was attracting negative public attention should have given the City reason to investigate whether An did, in fact, have sufficient financing to complete the project.

[23] Second, the unfinished project and negative public attention *did*, in fact, give the City reason to investigate. Specifically, the City retained KPMG to perform a "forensic audit specific to the YMCA project, to determine if the disbursements had been made . . . properly and if all the funds were accounted

for." Appellant's App. Vol. III p. 218.[3] The City also allowed representatives from the SBOA to tour and evaluate the unfinished building. The *actual* commencement of an investigation clearly shows that the City had *reason* to investigate.

[24] Third, KPMG's investigation revealed that the Bank's trustee "had not obtained" the "documentation for the various distributions related to the YMCA project." *Id.* at 217. Additionally, in the course of KPMG's audit, Chad failed to comply with the firm's documentation requests. The trial court recognized the significance of this fact:

> And . . . you have your forensic accounting from—because you have—and there's smoke. You're concerned. You, you want to do some investigation and the forensic accounting group comes back and says, "He[4] won't give us the information." Isn't that more smoke? I mean, wouldn't you be on notice at that point?

Tr. Vol. II p. 60.

[25] Fourth, as of May 2013—nearly four and one-half years after the bond issue—An was actively seeking additional investments for the completion of the

---

[3] The City argues that generally, the duty of an auditor does not extend to discovering fraud. That is beside the point in this case, however, as KPMG was hired to conduct a *forensic* audit.

[4] "He" referred to the mayor's brother, Chad, who was the project manager and did not comply with KPMG's document requests.

project. An's continued fundraising triggered a duty to inquire further as to whether his initial financing was falsified.

[26] Fifth, by 2014, An had not spent even close to $5.5 million on the project. The estimates in the record vary from $2 million to over $3 million. The bonds were issued on the understanding that An had another $3 million in hand. The fact that, four years later, he had not spent close to the total amount, and the project remained unfinished, should have caused the City to question the validity of the financing information accompanying the original 2009 bond issue.

[27] All this evidence together clearly shows that, long before February 2015, the City had sufficient information to cause it to inquire further to determine whether a legal wrong had occurred. The City's arguments to the contrary do not change this conclusion.

[28] The City first contends that it did not suffer an injury until An died in December 2015. This position, however, is inconsistent with the City's claims, which are premised on an allegation that the City was injured at the time of the original 2009 bond issue because it was allegedly completed based on false financing information.

[29] Next, the City argues that the statute of limitations did not begin to accrue because it did not uncover any wrongdoing by LWG. It relies both on Mayor Seybold's statements that he believed that LWG had done a great job and expected that the project would be a success and the fact that the KPMG audit did not uncover actual wrongdoing. This argument is unavailing for two

reasons. First, we apply an *objective*, rather than a subjective, standard to the discovery rule, asking when the plaintiff knew *or should have known* to inquire further. Second, the City's argument would mean that meritless claims could never be time-barred, because the lack of merit would prevent the inexistent wrongdoing from being discovered. The statute of limitations begins to accrue when the plaintiff has enough information to begin the inquiry process, not when, in the course of that process, actual wrongdoing is discovered.

[30] Finally, the City argues that LWG has not met its burden as the movant because it has not established that before February 2015, the City was aware that its damages were attributable to LWG. Initially, we note again that the City's alleged damages stem from the 2009 bond issue. And in the context of that process, the City viewed LWG as a fiduciary that was responsible for disclosing information about An's financial status. Consequently, the City was on notice to investigate claims against LWG once it was on notice that the bonds may have been issued based on incorrect financing information.

[31] Moreover, this Court has found claims to be time-barred where the victim was aware of an injury but unaware of the identity of the tortfeasor until after the limitations period had ended. *See Dotson v. Stryker Corp.*, 108 N.E.3d 376, 384 & n.10 (Ind. Ct. App. 2018) (statute of limitations began to run when plaintiff "knew that [defendants] were in her operating room, though she did not know who they were"); *Rieth-Riley Constr. Co. v. Gibson*, 923 N.E.2d 472, 476-77 (Ind. Ct. App. 2010) (declining to "extend the discovery rule to apply to cases like this one where the indeterminate fact is not the existence of an injury, but rather

the identity of a tortfeasor"); *Richards-Wilcox, Inc. v. Cummins*, 700 N.E.2d 496, 498 (Ind. Ct. App. 1998) (holding that the fact that the plaintiff "did not determine until over two years later the actual identity of the party causing the injury did not suspend the running of the statute of limitations"). Consequently, while the record shows that the City should have been aware of its potential claims against LWG before February 2015, even if that were not the case, the limitations period would not have been tolled.

In sum, the undisputed evidence in the record shows that the City had enough information long before February 2015 to have caused it to inquire further regarding possible wrongdoing. And, in fact, it *did* inquire further by instituting investigations from KPMG and the State Board of Accounts. Therefore, we find that the discovery rule bars these two claims against LWG.

## B. Continuous Representation

Next, the City argues that the continuous representation doctrine prevents its claims from being time-barred. This doctrine tolls the statute of limitations when a professional advisor, such as an attorney,[5] commits an error during the course of a professional engagement. *Biomet, Inc. v. Barnes & Thornburg*, 791 N.E.2d 760, 765 (Ind. Ct. App. 2003). Under those circumstances, the statute does not begin to run until the professional relationship relating to the matter at

---

[5] This Court has expressly refused to extend this doctrine to financial advisors. *Landmark Legacy, LP v. Runkle*, 81 N.E.3d 1107, 1118-19 (Ind. Ct. App. 2017).

issue has been terminated. *Id.* The purpose of the doctrine is to allow professionals to try to mitigate the effects of their errors, potentially avoiding litigation altogether. A collateral benefit is that the professional relationship is preserved while the professional attempts to mitigate the effects of its error. *Id.* at 765-66.

[34] The City neglects to address the fact that this doctrine applies only if the defendant continued to represent the plaintiff in the "specific matter" in which the alleged misconduct occurred. *Bambi's Roofing, Inc. v. Moriarty*, 859 N.E.2d 347, 358 (Ind. Ct. App. 2006). We agree with LWG that the specific matter in which the alleged misconduct occurred was not the YMCA project as a whole; it was the original bond issue, which was concluded in 2009. Specifically, Mayor Seybold and Swintz agreed that LWG's role was to determine "how much room is in the TIF district to do this project" and ensure that the City could "pay back the bonds." Appellant's App. Vol. II p. 197, 227. That is a specific role in connection with a particular bond issue rather than the role of a project developer. Every witness who addressed the issue understood that LWG's responsibilities concluded when the bond issue closed. *Id.* at 202-03 (Mayor Seybold); *id.* at 224 (Swintz); Appellant's App. Vol. III p. 95 (Donaldson). No witness disputed this or suggested any ambiguity. Moreover, LWG was paid out of the bond proceeds, meaning that its compensation structure also confirms that the 2009 bond issue was a discrete engagement. Under these circumstances, we find that the continuous representation doctrine does not apply to toll the statute of limitations period.

## C. Fraudulent Concealment

Next, the City argues that LWG fraudulently concealed its alleged misconduct. Specifically, the City argues that LWG fraudulently concealed the Memo and, as a result, the statute of limitations period should be tolled.

The fraudulent concealment doctrine "operates to estop a defendant from asserting the statute of limitations as a bar to a claim whenever the defendant, by his own actions, prevents the plaintiff from obtaining the knowledge necessary to pursue a claim." *Doe v. Shults-Lewis Child & Family Servs.*, 718 N.E.2d 738, 744 (Ind. 1999). And where the parties are in a fiduciary relationship, the concealment need not be active, and a mere failure to disclose information for which there is a duty to disclose gives rise to fraudulent concealment. *Farmers Elevator Co. of Oakland, Inc. v. Hamilton*, 926 N.E.2d 68, 79-80 (Ind. Ct. App. 2010).

However, when "the plaintiff obtains information that would lead to the discovery of the cause of action through ordinary diligence, the statute of limitations begins to run, regardless of any fraudulent concealment perpetrated by the defendant." *Snyder v. Town of Yorktown*, 20 N.E.3d 545, 551 (Ind. Ct. App. 2014) (internal quotation omitted). Here, as noted above, the City knew or should have known well before February 2015—even without the Memo— that it needed to inquire further as to possible damages caused by a tortfeasor. Therefore, even with the alleged fraudulent concealment, the City was on

notice of the situation in 2014 at the very latest. Under these circumstances, the doctrine of fraudulent concealment does not toll the limitations period.

## D. Adverse Domination

[38]   Finally, the City argues that the adverse domination doctrine tolled the statute of limitations until at least the end of Mayor Seybold's administration on December 31, 2015. This doctrine is based on the principle that a corporate entity "can only 'discover' an injury to itself, and act to redress that injury, to the extent that those individuals who control it know of the injury and are willing to act on that knowledge." *Resolution Trust Corp. v. O'Bear, Overholser, Smith & Huffer*, 840 F. Supp. 1270, 1284 (N.D. Ind. 1993). In other words, where an entity is dominated "by those whose own malfeasance might be revealed in the course of litigating a complaint, it follows the entity has not 'discovered' the injury to its interests in any meaningful way." *Id.* This doctrine has never been applied in Indiana by an Indiana appellate court.

[39]   In invoking this doctrine, the City argues that Mayor Seybold controlled the City, that he committed malfeasance, and that the City could not have discovered its injuries in any meaningful way. The City notes the following evidence in the record:

- On May 25, 2011, Mayor Seybold signed an application for a $1 million life insurance policy, naming himself as the insured, his wife and children as beneficiaries, and An as the payor. An used bond proceeds to pay at least one premium on that life insurance policy.
- An's companies used bond proceeds to make campaign contributions to Mayor Seybold and cash payments to the mayor's wife.

- An hosted a political fundraiser for Mayor Seybold in California in 2011.
- Mayor Seybold had a conflict of interest because An employed the mayor's brother, Chad, as the manager on the YMCA project. Indeed, it appears that the mayor conditioned the provision of bond funds to An on An's agreement to hire Chad.
- Chad did not comply with KPMG's document requests during the forensic audit and the mayor did not ask him to.
- Mayor Seybold may have been unwilling to pursue legal action against LWG because the company was a significant financial contributor to the mayor's campaigns and Swintz was a close political advisor.

The City argues that this evidence creates a genuine issue of material fact "as to whether Mayor Seybold could have been expected to redress the City's interests by filing suit over the project during his administration." Appellant's Br. p. 56-57.

[40] The primary problem with the City's argument is that it does not, and cannot, show that Mayor Seybold "dominated" the City. Several individuals could have discovered and pursued claims against LWG, including the two different Directors of Development, the City Attorney, and at least one member of the City Council. Nothing in the record shows that Mayor Seybold could have prevented these individuals from redressing the City's interests. It is the head of the City's law department, rather than the mayor, who commences proceedings needed to protect the City's interests. Ind. Code § 36-4-9-12. It is simply not credible, based either on this record or common knowledge of the way municipalities operate, to conclude that Mayor Seybold dominated the City in any form or fashion. Consequently, this argument is unavailing.

In sum, the discovery rule applies because long before February 2015, the City had sufficient information that it knew or should have known that it needed to conduct further inquiry to determine if it had been damaged as a result of tortious conduct. And none of the exceptions to the discovery rule, including the doctrines of continuous representation, fraudulent concealment, and adverse domination, toll the limitations period in this case. Therefore, the trial court did not err by granting summary judgment in favor of LWG on the City's two claims that have a two-year statute of limitations.

## II. Cross-Appeal

The trial court found that the City's claim for constructive fraud/unjust enrichment is governed by a six-year statute of limitations, meaning that the claim was not time-barred and survived summary judgment. LWG argues that this conclusion was erroneous.

We ascertain the applicable statute of limitations "by identifying the nature or substance of the cause of action and not of the form of the pleadings." *Whitehouse v. Quinn*, 477 N.E.2d 270, 273 (Ind. 1985). Generally, fraud claims are governed by a six-year statute of limitations. I.C. § 34-11-2-7. But a two-year statute of limitations may apply to constructive fraud claims if the substance of the claims warrants it. For example, in one case, the plaintiff filed a legal malpractice claim against his former attorney. *Keystone Distrib. Park v. Kennerk, Dumas, Burke, Backs, Long & Salin*, 461 N.E.2d 749 (Ind. Ct. App. 1984). The plaintiff also alleged constructive fraud, but after inspecting the

substance of the claims, this Court found that the alleged constructive fraud was "merely one example of the asserted attorney malpractice . . . ." *Id.* at 752. This Court had disallowed the attorney malpractice claim as being barred by the two-year statute of limitations and was compelled to do the same to the constructive fraud count because it was "of the same ilk." *Id.* This Court has reached similar conclusions in at least two other cases. *See Myers v. Maxson*, 51 N.E.3d 1267, 1277 n.10 (Ind. Ct. App. 2016) (applying a two-year limitations period to all claims because the allegations of constructive fraud were "substantively part of his legal malpractice claim"); *Small v. Centocor, Inc.*, 731 N.E.2d 22, 29 (Ind. Ct. App. 2000) (applying a two-year limitations period to all claims, including fraud and constructive fraud, because "at the root of all the claims" was the medical care given to the plaintiff's father).

[44] In this case, the constructive fraud/unjust enrichment count is comprised of just six paragraphs. One incorporates the prior allegations and three more deal with damages. As the basis of the claim, the City alleges that LWG breached fiduciary duties, "amounting to constructive fraud," and those breaches included, among other things, failing to disclose material facts to the City—as set forth in the preceding paragraphs on the other claims. Appellant's App. Vol. III p. 41-42. The City has never explained how a trial on the constructive fraud claim would differ at all from a trial on the other two counts. If the City were permitted to extend the statute of limitations merely by asserting a claim for constructive fraud, it would make "all actions for" breach of fiduciary duty

"governed by the longer statute of limitations merely by reason of the fact that some" constructive fraud "could be alleged." *Whitehouse*, 477 N.E.2d at 274.

[45] The City rests its argument on the fact that constructive fraud has legal elements that are different from the elements of breach of fiduciary duty or negligence. Obviously, that is and has always been the case, but this Court has found repeatedly that, depending on the nature of the facts and allegations, a constructive fraud claim may be so substantively similar to the other claims at issue that it is nonetheless governed by the shorter limitations period.

[46] Consequently, we agree with LWG that the two-year statute of limitations should govern the constructive fraud/unjust enrichment claim in this case. And for all the reasons already expressed herein, this claim is time-barred. Accordingly, we reverse the trial court's denial of LWG's summary judgment motion on the constructive fraud claim and remand with instructions to enter summary judgment in LWG's favor.

[47] The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions to enter summary judgment in LWG's favor on the City's claim for constructive fraud/unjust enrichment.

Bradford, C.J., and Pyle, J., concur.